# FEDERAL COMMUNICATIONS COMMISSION ET AL. *v.* FLORIDA POWER CORP. ET AL.

No. 85–1658.   Argued December 3, 1986—Decided February 25, 1987*

*Together with No. 85–1660, *Group W Cable, Inc., et al.* v. *Florida Power Corp. et al.*, also on appeal from the same court.

MARSHALL, J., delivered the opinion for a unanimous Court. POWELL, J., filed a concurring opinion, in which O'CONNOR, J., joined, *post*, p. 254.

*Deputy Solicitor General Wallace* argued the cause for appellants in No. 85–1658. With him on the brief were *Solicitor General Fried, Harriet S. Shapiro,* and *Jack D. Smith. Jay E. Ricks* argued the cause for appellants in No. 85–1660. With him on the briefs were *Brenda L. Fox, E. Barrett Prettyman, Jr.,* and *J. Christopher Redding.*

*Allan J. Topols* argued the cause for appellees in both cases and filed a brief for appellee Florida Power Corp. With him on the brief was *Harry A. Evertz III. Peyton G. Bowman III* and *Daniel J. Wright* filed a brief for appellees Alabama Power Co. et al. *Shirley S. Fujimoto* and *Ralph A. Simmons* filed a brief for appellee Tampa Electric Co.†

---

†*Paul Glist* filed a brief for the Texas Cable TV Association, Inc., et al. as *amici curiae* urging reversal in No. 85–1658.

Briefs of *amici curiae* urging affirmance were filed for the Edison Electric Institute by *Robert L. Baum* and *Jan J. Sagett;* for the Mountain States Telephone and Telegraph Co. et al. by *L. Andrew Tollin;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *John H. Findley.*

JUSTICE MARSHALL delivered the opinion of the Court.

These cases present consolidated appeals from a single decision of the United States Court of Appeals for the Eleventh Circuit holding that 47 U. S. C. § 224 (the Pole Attachments Act) effects an unconstitutional taking of property without just compensation.

I

The Pole Attachments Act, 92 Stat. 35, as amended, 47 U. S. C. § 224, was enacted by Congress as a solution to a perceived danger of anticompetitive practices by utilities in connection with cable television service. Cable television operators, in order to deliver television signals to their subscribers, must have a physical carrier for the cable; in most instances underground installation of the necessary cables is impossible or impracticable. Utility company poles provide, under such circumstances, virtually the only practical physical medium for the installation of television cables. Over the past 30 years, utility companies throughout the country have entered into arrangements for the leasing of space on poles to operators of cable television systems. These contracts have generally provided for the payment by the cable companies of a yearly rent for space on each pole to which cables were attached, the fixed costs of making modifications to the poles and of physical installation of cables being borne by the cable operators. In many States the rates charged by the utility companies for these attachments have not been subject to regulation.

In response to arguments by cable operators that utility companies were exploiting their monopoly position by engaging in widespread overcharging, Congress in the Pole Attachments Act authorized the Federal Communications Commission to fill the gap left by state systems of public utilities

---

Briefs of *amici curiae* were filed for the Association of American Railroads by *Paul A. Cunningham* and *Kenneth P. Kolson;* and for Nor-West Cable Communications et al. by *Harold R. Farrow, Sol Schildhause,* and *Siegfried Hesse.*

regulation.[1]  See S. Rep. No. 95–580, pp. 12–14 (1977). The Act provides that any cable company operating in a State which does not regulate the rates, terms, and conditions of pole attachments may seek relief from alleged overcharging before the Commission, which is empowered to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable . . . ."  47 U. S. C. § 224(b)(1).  The Act establishes a standard for the Commission's determination of rates, providing that "a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way." § 224(d)(1).

In 1963, appellee Florida Power Corporation (Florida Power) entered into a pole attachment agreement with appellant Cox Cablevision Corporation (Cox).  Florida Power subsequently, in 1977 and 1980, contracted for similar purposes with Teleprompter Corporation and Teleprompter Southeast, Inc. (Teleprompter), and Acton CATV, Inc. (Acton), respectively.[2]  In November 1980, Teleprompter filed a complaint with the FCC, alleging that its 1980 per pole rent of $6.24 was unreasonable under the Act.  In February 1981, Acton filed a complaint concerning the rate under its agreement, which was $7.15 per pole.  In July 1981, the Commis-

---

[1] The Commission had previously investigated allegations of overcharging by utilities, but had concluded that it had no jurisdiction because pole attachments were not "communications by wire or radio" under the Communications Act, 48 Stat. 1064, as amended, 47 U. S. C. § 151.  See *California Water & Telephone Co.*, 64 F. C. C. 2d 753, 758 (1977).

[2] Florida Power's agreements with Cox and Acton were for a minimum term of one year, thereafter terminable by either party on six months' notice.  The agreement with Teleprompter provided for a minimum term of 5½ years, terminable thereafter on six months' notice.

sion's Common Carrier Bureau issued a memorandum opinion and order finding in favor of Teleprompter and Acton, reforming the agreements to provide in both cases for yearly rents of $1.79 per pole, and ordering refunds of excess rents paid after the filing of the complaints.[3]   Florida Power filed an application for review by the FCC; during the pendency of this application Cox filed a complaint seeking revision of the rent charge under its 1963 agreement, which was at that time set at $5.50 per pole.   The Common Carrier Bureau ordered reformation of Cox's agreement to provide for rent of $1.79 per pole.   In September 1984 the FCC, in a single order, approved the orders of the Common Carrier Bureau in all three cases.   The Commission rejected constitutional arguments raised by Florida Power under the Takings and Due Process Clauses, and upheld the rate calculations made by the Bureau.

Florida Power then sought review of the FCC's decision in the United States Court of Appeals for the Eleventh Circuit.[4]   Neither Florida Power nor any of the intervenors argued before the Eleventh Circuit that the Pole Attachments Act was unconstitutional.[5]   The Court of Appeals nonetheless held in a *per curiam* opinion that the Pole Attachments Act violated the Fifth Amendment.   772 F. 2d 1537 (1985).

---

[3] The rate ordered by the Commission was in both instances substantially lower than the rate which the cable operators had asked the Commission to adopt.   The cable operators, after review of information provided by Florida Power, had requested the imposition of annual rents of approximately $2.20 per pole.

[4] Appellants in No. 85–1660, Group W Cable, Inc., National Cable Television Association, Inc., and Cox Cablevision Corporation, intervened before the Court of Appeals supporting the FCC.   Tampa Electric Company, Alabama Power Company, Arizona Public Service Company, and Mississippi Power and Light Company, appellees in both cases, intervened before the Court of Appeals in support of Florida Power.

[5] Florida Power's opening brief in the Court of Appeals stated that its petition for review of the Commission's order did not "involve a facial attack on the constitutionality of a legislative act."   See Brief for Petitioner in No. 84–3683 (CA11), p. 35.

The court first concluded that the Act effected a taking of property because it authorized a permanent physical occupation of property under our decision in *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982). 772 F. 2d, at 1544. The court then struck down the Act under the Fifth Amendment because it authorizes the FCC to make the initial determination of the amount of compensation to be paid under legislatively prescribed standards. "By prescribing a 'binding rule' in regard to the ascertainment of just compensation," the court stated, "Congress has usurped what has long been held an exclusive judicial function." *Id.*, at 1546.

The FCC and intervenor cable operators noticed separate appeals from this decision. We noted probable jurisdiction and consolidated the cases for argument and decision, 476 U. S. 1156 (1986). We now reverse.

## II

The Court of Appeals found at the outset that the Pole Attachments Act authorizes a permanent physical occupation of property, which, under the rule we adopted in *Loretto*, is *per se* a taking for which compensation must be paid. 772 F. 2d, at 1543–1544. We disagree with this premise, for we find that *Loretto* has no application to the facts of this litigation.

In *Loretto* we reviewed a New York statute which prohibited any owner of rental property from "interfer[ing] with the installation of cable television facilities upon his property or premises," and provided that the landlord could charge cable operators for access to his property only the amount "which the [State Commission on Cable Television] shall, by regulation, determine to be reasonable." 458 U. S., at 423, and n. 3. The appellant in *Loretto* had purchased an apartment building upon the roof of which appellee had mounted cables and switching boxes for the provision of cable television service to tenants. The State Commission on Cable Television had declared that a one-time charge of $1 might be levied by

landlords in return for the statutory compulsory access to property.  *Id.*, at 424–425.  We found that our prior decisions interpreting the Takings Clause, along with the purposes of the Clause itself, compelled the conclusion that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve."  *Id.*, at 426.  We reversed the holding of the New York Court of Appeals that the challenged statute did not take property within the meaning of the Fifth Amendment, and remanded for consideration of the issue whether just compensation had been paid.

We characterized our holding in *Loretto* as "very narrow." *Id.*, at 441.  The Court of Appeals in its decision in these cases broadened that narrow holding beyond the scope to which it legitimately applies.  For, while the statute we considered in *Loretto* specifically *required* landlords to permit permanent occupation of their property by cable companies, nothing in the Pole Attachments Act as interpreted by the FCC in these cases gives cable companies any right to occupy space on utility poles, or prohibits utility companies from refusing to enter into attachment agreements with cable operators.[6]  The Act authorizes the FCC, in the absence of par-

---

[6] The Court of Appeals found, and appellees contend here, that "[t]he hard reality of the matter is that if Florida Power desires to exclude the cable companies, for whatever reason, they are powerless to do so . . . because in previous cases where utilities have ordered cable companies to disconnect, the FCC has routinely intervened by issuing temporary stays which prevent the exclusion of the cable companies."  772 F. 2d 1537, 1543 (1985).  According to the Solicitor General, the FCC "has not yet taken a position" on whether utilities may terminate attachment contracts for non-retaliatory reasons.  Tr. of Oral Arg. 7.  The language of the Act provides no explicit authority to the FCC to require pole access for cable operators, and the legislative history strongly suggests that Congress intended no such authorization.  See, *e. g.*, S. Rep. No. 95–580, p. 16 (1977) (The Act "does not vest within a CATV system operator a right to access to a utility pole, nor does the bill, as reported, require a power company to dedicate a portion of its pole plant to communications use").  We do not decide today what the application of *Loretto* v. *Teleprompter Manhattan CATV Corp.*,

allel state regulation, to review the rents charged by public utility landlords who have voluntarily entered into leases with cable company tenants renting space on utility poles. As we observed in *Loretto*, statutes regulating the economic relations of landlords and tenants are not *per se* takings. *Id.*, at 440; see *Bowles* v. *Willingham*, 321 U. S. 503, 517–518 (1944); *Block* v. *Hirsh*, 256 U. S. 135, 157 (1921); see also *Fresh Pond Shopping Center, Inc.* v. *Callahan*, 464 U. S. 875 (1983) (dismissing challenge to rent control ordinance under *Loretto* for want of substantial federal question). "So long as these regulations do not *require* the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity." *Loretto, supra,* at 440 (emphasis added).

This element of required acquiescence is at the heart of the concept of occupation. As we said in *Loretto:*

> "[P]roperty law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property. To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury. Furthermore, such an occupation is qualitatively more severe than a regulation of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion." 458 U. S., at 436 (citation omitted).

Appellees contend, in essence, that it is a taking under *Loretto* for a tenant invited to lease at a rent of $7.15 to remain at the regulated rent of $1.79. But it is the invitation, not the rent, that makes the difference. The line which separates these cases from *Loretto* is the unambiguous distinc-

---

458 U. S. 419 (1982), would be if the FCC in a future case required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements.

tion between a commercial lessee and an interloper with a government license.   We conclude that the Court of Appeals erred in applying the *per se* rule of *Loretto* to the Pole Attachments Act.

## III

The remaining question, whether under traditional Fifth Amendment standards the challenged FCC order effected a taking of property, is readily answered.   It is of course settled beyond dispute that regulation of rates chargeable from the employment of private property devoted to public uses is constitutionally permissible.   See *Munn* v. *Illinois*, 94 U. S. 113, 133–134 (1877); *Permian Basin Area Rate Cases*, 390 U. S. 747, 768–769 (1968).   Such regulation of maximum rates or prices "may, consistently with the Constitution, limit stringently the return recovered on investment, for investors' interests provide only one of the variables in the constitutional calculus of reasonableness." *Id.*, at 769.   So long as the rates set are not confiscatory, the Fifth Amendment does not bar their imposition.   *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 53 (1936); see *Permian Basin, supra*, at 770.

The Pole Attachments Act, as previously noted, provides a range of reasonableness within which the FCC may undertake ratesetting.   The Act provides that the minimum reasonable rate is equal to "the additional costs of providing pole attachments," while the maximum reasonable rate is to be calculated "by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way."   47 U. S. C. § 224(d)(1).   The minimum measure is thus equivalent to the marginal cost of attachments, while the statutory maximum measure is determined by the fully allocated cost of the construction and operation of the pole to which cable is attached.

The FCC has evidently interpreted the statute to provide that when it reduces the contract rate for pole attachments, it may only reduce to the maximum rate allowed under the statute. Tr. of Oral Arg. 10. The rate imposed by the Commission in this case was calculated according to the statutory formula for the determination of fully allocated cost. App. to Juris. Statement of FCC 23a. Appellees have not contended, nor could it seriously be argued, that a rate providing for the recovery of fully allocated cost, including the actual cost of capital, is confiscatory.[7] Accordingly, we hold that the the FCC regulatory order challenged below does not effect a taking of property under the Fifth Amendment.

## IV

Because we hold that the Pole Attachments Act does not authorize a taking of property within the meaning of the Fifth Amendment, the holding of the Court of Appeals, that the Act is void because it unconstitutionally constrains the judicial determination of just compensation for takings, necessarily falls.[8] The decision of the Court of Appeals is

*Reversed.*

JUSTICE POWELL, with whom JUSTICE O'CONNOR joins, concurring.

I join the Court's opinion, and write only to state generally my understanding as to the scope of judicial review of rates determined by an administrative agency. I agree that the FCC regulatory order challenged in these cases does not effect

---

[7] In view of the Commission's interpretation of the statute, and use of the fully allocated cost measure in this case, we have no occasion to consider the constitutionality of the minimum rate allowable under the statute.

[8] Our disposition of the takings question makes it unnecessary to review on the merits the Court of Appeals' holding that Congress may not establish standards under which the initial determination of compensation will be made by an administrative authority subject to final judicial review.

an unconstitutional taking of property. In the Court's brief discussion of "traditional Fifth Amendment standards," it quotes a single sentence from the *Permian Basin Area Rate Cases*, 390 U. S. 747 (1968), to the effect that regulation of maximum rates "may, consistently with the Constitution, limit stringently the return recovered on investment, for investors' interests provide only one of the variables in the constitutional calculus of reasonableness," *id.*, at 769.

The inquiry mandated by the Constitution is considerably more complex than this simple statement reflects. Justice Harlan's opinion for the Court in that case is some 74 pages long. In addition, Justice Douglas wrote an interesting, and relevant, dissenting opinion. The one sentence included in today's opinion in no way accurately portrays the full rationale of judicial review of ratemaking by administrative tribunals. Other portions of the *Permian* opinion could be quoted to indicate that the standard gives governments far less leeway. Indeed, on the next page in *Permian* the Court identifies the relevant standard of review under the Natural Gas Act as "just and reasonable," *id.*, at 770, and the opinion goes on to suggest that the Commission's rates must be selected "from the broad zone of reasonableness." *Ibid.* A second rate case in which several Justices carefully considered the role courts should play in reviewing administrative ratemaking orders is *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591 (1944). Justice Douglas, writing for the Court, stated that the "just and reasonable" standard required that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks." *Id.*, at 603.

I do not suggest that this isolated sentence from *Hope Natural Gas* is any more to be viewed as *the* appropriate standard than the sentence from *Permian Basin* the Court quotes today. My point is only that judicial review of rates challenged as taking property without just compensation involves careful consideration of the relevant statute, the action of the

regulatory commission, and a complex of other factors. The rates before us clearly comport with the Constitution. In my view no purpose is served by selecting for quotation a single sentence that, standing alone, is meaningless at best.