**MEDIA GENERAL CABLE OF FAIRFAX, INC., Plaintiff,**

v.

**SEQUOYAH CONDOMINIUM COUNCIL OF CO–OWNERS, Defendant,**

**Amsat Communication, Inc., Intervenor–Defendant.**

**Civ. A. No. 89–1077–A.**

United States District Court, E.D. Virginia, Alexandria Division.

May 22, 1990.

David C. Kohler and E. Ford Stephens, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for Media General Cable of Fairfax, Inc.

Stephen R. Pickard, Alexandria, Va., for Sequoyah Condominium Council of Co–Owners.

Robert A. Rowan, Nixon & Vanderhye, Arlington, Va., and W. James MacNaughton, Schenck, Price, Smith & King, Morristown, N.J., for Amsat Communication, Inc., intervenor.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

In this declaratory judgment action, Media General Cable of Fairfax, Inc. ("Media General"), a cable television franchisee, seeks a declaration that Section 621(a)(2) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 541(a)(2) (the "Act"), entitles it to install its cable wires in compatible easements on the Sequoyah Condominium's ("Sequoyah") common areas. The Sequoyah Condominium Council of Co–Owners ("the Council"), the condominium's governing body, acting pursuant to an exclusivity provision in its agreement with the current television provider, Amsat Communication, Inc. ("Amsat"), has thus far refused Media General permission to install its equipment. In an earlier opinion in this case,[1] the Court permitted Amsat's intervention and ruled that the Act provided Media General with an implied private cause of action to enforce whatever rights it might have under the Act. At the conclusion of the prior opinion, the Court directed the parties to submit materials responsive to seven questions.[2] These questions were designed to elicit responses that would establish a factual record adequate to allow the Court to determine whether the Act confers on Media General any rights to use the specific easements that exist at Sequoyah. The parties' responses produced such a record and also disclose that no material fact is genuinely disputed. The matter is therefore ripe for summary disposition. *See* Rule 56, Fed.R.Civ.P. The Court must now determine whether the previously found implied private right of action fits the facts of this case.

### Facts[3]

Media General holds a nonexclusive cable television franchise in Fairfax County, Virginia, the county within which Sequoyah is located. Sequoyah contains 1018 individual units consisting of three distinct building types: (1) adjoining townhouses, (2) three

---

**1.** *See Media General Cable of Fairfax, Inc. v. Sequoyah Condominium Council of Co–Owners,* 721 F.Supp. 775 (E.D.Va.1989).

**2.** The seven questions were:

(1) Identify and describe with particularity each easement Media General contemplates using to provide cable TV service to requesting unit owners in the Sequoyah complex.

(2) Whether any taking of property would be involved in Media General's provision of service to requesting unit owners and, if so, identify each taking.

(3) Whether each of the easements Media General contemplates using has been "dedicated for compatible uses."

(4) Whether Media General's access to any existing dedicated compatible use easements amounts to an additional servitude on the underlying property and, if so, whether it is a taking.

(5) Whether Media General's access to any existing dedicated compatible use easements

can be accomplished consistent with Section 621(a)(2)(A) and (B).

(6) Whether installation of Media General's cables in existing dedicated compatible easements will occasion the need for just compensation pursuant to Section 621(a)(2)(C).

(7) Whether Media General seeks access to existing dedicated compatible use easements even if the facts ultimately show that such easements, by themselves, would not permit Media General to reach the requesting unit owners without crossing over private property controlled by the Council.

*Media General Cable of Fairfax, Inc.,* 721 F.Supp. at 783.

**3.** The principal factual focus here is on the nature of the easements Media General claims it has rights to use under the Act. Even so, a brief recapitulation of some facts stated in the prior opinion is necessary.

story garden style units, and (3) five plex units. Individual unit owners own the interiors of each residential unit, but the common areas, *i.e.*, the building exteriors and grounds, are held jointly by all the unit owners as tenants-in-common. The Council, composed collectively of all unit owners, is responsible for administering the complex and supervising its management. Pursuant to this power, the Council entered into an exclusive contract with Amsat's predecessor to provide television service to Sequoyah via a satellite master antenna television system. Amsat is not franchised. Amsat's current contract expires in 1998, but may be subject to renewal by the parties.

Media General claims it was approached by several unit owners about receiving its cable service. Media General then sought the Council's permission to lay its cable across the complex's common areas. The Council denied access, citing an exclusivity clause in the Amsat agreement. Media General now seeks a judicial determination of its right to compel access pursuant to section 621(a)(2) of the Act, which provides in pertinent part:

> Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is [sic] within the area to be served by the cable system and which have been dedicated for compatible uses. . . .

47 U.S.C. § 541(a)(2). Specifically, Media General asserts that there are four "compatible" easements at Sequoyah through which it has a right under the Act to lay its cable: (1) a Virginia Power easement, (2) a C & P Telephone easement, (3) Amsat's television easement, and (4) a blanket utility easement in Sequoyah's Master Deed.

The Virginia Power easements grant the utility a perpetual right to use rights-of-way across the Sequoyah common areas "to lay, construct, operate and maintain one or more lines of underground conduits and cables as Company may from time to

time deem expedient or advisable . . . for the purpose of transmitting and distributing electric power by one or more circuits; and for telephone, television and other communication purposes." There are two types of Virginia Power rights-of-way: (i) designated, *i.e.*, those shown on plats recorded in Fairfax County's land records and (ii) undesignated, *i.e.*, those not shown on recorded plats. The designated rights-of-way are 10 feet wide. Undesignated rights-of-way extend from the designated rights-of-way to the improvements on each lot shown on the plat through an unspecified route discretionarily selected by Virginia Power.

The C & P Telephone easements at Sequoyah, like those of Virginia Power, also permit the installation and maintenance of an underground cable system in designated rights-of-way of various widths (8–15 feet). Notably, these perpetual easements permit C & P to carry "the wires, cables, circuits and appurtenances of any other Company, including all electric wires" within the boundaries of the rights-of-way.

In contrast to the Virginia Power and C & P Telephone easements, the Amsat easement is entirely undesignated. It grants Amsat permission to construct and maintain its system anywhere in the common areas. The corresponding licensing agreement between Sequoyah and Amsat specifies where certain large pieces of equipment are to be located, but neither it nor the easement specifies where the remainder of the system, including the underground cable, is to be placed. Also, unlike the other easements, Amsat's right of access is not perpetual; it is limited to the duration of Amsat's agreement with Sequoyah or any renewal of that agreement. As of now, Amsat's agreement, if not renewed, will expire in 1998.

The final easement Media General claims is "compatible" and usable under the Act is a blanket utility easement. Section XIV(B) of the Sequoyah Master Deed [4] grants:

---

**4.** The Master Deed submitted to the Court pertains only to phase I of Sequoyah, which by the deed's terms consists of only 220 apartments.

The record is unclear whether units in the remaining areas at Sequoyah are subject to a similar provision.

a blanket easement upon, across, over and under all of the property for ingress, egress, installation, replacing, repairing, and maintaining a master television antenna system and all utilities including, but not limited to, water, sewers, telephones and electricity. By virtue of this easement, it shall be expressly permissible for the providing utility company to erect and maintain the necessary poles and other necessary equipment on said property and to affix and maintain utility wires, circuits and conduits on, above, across and under the roofs and exterior walls of the residences[.][sic] [N]otwithstanding anything to the contrary contained in this paragraph, no sewers, electrical lines, water lines, or other utilities may be installed or relocated on said property except as ... approved by the Council. Should any utility furnishing a service covered by the general easement herein provided request a specific easement by separate recordable document, the Declarant or Council shall have the right to grant such easement on said property without conflicting with the terms hereof.

Though not explicit, the last sentence suggests that this easement was granted to utility companies in the abstract so they could provide service to the future Sequoyah unit owners. The only right reserved in the grant is that the Council must approve the location of the utility's system.

### Analysis

The inquiry appropriately begins with a statement of Media General's position. Simply put, Media General asserts that § 621 of the Act is a valid land use regulation that gives a cable television franchisee a statutory right to lay its cable over or under those areas of a landowner's property that are already the subject of private, "compatible", *i.e.* similar, use easements. This position is fundamentally flawed; it

rests on alternative assumptions: either, as claimed, that use of any of the easements at Sequoyah would not constitute a taking or the unstated assumption that the Act authorizes takings of private property. Neither of these assumptions is true. Close scrutiny of the Act's terms and its legislative history compels the conclusion that the Act does not authorize the taking of private property; instead it confers on cable television franchisees the far more limited right of access (1) "over public rights-of-way" and (2) through easements "which have been dedicated for compatible uses." 47 U.S.C. § 541(a)(2). And, an examination of the easements Media General seeks access to in this case discloses that they are neither "public rights-of-way" nor "dedicated" easements. Elucidation of this conclusion requires consideration of the following series of questions:

(I) Does the placement of Media General's cable in or along private easements involve a taking of private property in the constitutional sense?

(II) Does the Act permit such a taking?

(III) Are the four easements at Sequoyah private easements, public rights-of-way, or dedicated easements?

(IV) Does limiting a cable television franchisee's right of access under the Act to public rights-of-way or dedicated easements render the Act a nullity?

### I

■ Prior to 1982, legislation granting access to cable television franchisees was viewed as a land use regulation that might or might not rise to the level of a taking depending on the application of the *ad hoc*, multifactor inquiry described in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).[5] This changed when the Supreme Court handed down *Loretto v.*

---

5. *Penn Central Transportation Co.,* involved land use constraints on New York's Grand Central Terminal following its designation as a "landmark" under New York City's Landmarks Preservation Law. Although each case considering whether a land use regulation amounts to a taking rests on its own facts, the Supreme Court noted three factors in the analysis of "particular significance": (1) the economic impact of the regulation; (2) the extent to which the regulation interferes with distinct investment-backed expectations; and (3) the character of the governmental action. 438 U.S. at 124, 98 S.Ct. at 2659.

*Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). There, on facts analogous to those at bar, the Supreme Court held that permanent physical occupations of land are takings *per se* and that land use regulations resulting in such occupations need not be subjected to the usual *Penn Central* fact intensive inquiry. In *Loretto,* a New York statute prevented a landlord from interfering with the installation of cable television facilities on his property. Loretto, who had purchased an apartment building in Manhattan after cable television wires had been placed on the building's roof, sued the local franchisee claiming, *inter alia,* that cable installation pursuant to the statute constituted a taking without just compensation. The New York Court of Appeals, after conducting the *Penn Central* analysis, ruled that cable placement pursuant to the statute did not constitute a taking.[6] The Supreme Court reversed, holding that the cable on the building was a "permanent physical occupation of land" and hence a taking *per se* not subject to the *Penn Central ad hoc* inquiry. *Loretto,* 458 U.S. at 441, 102 S.Ct. at 3179.

Applied here, *Loretto* teaches that the placement of Media General's cable system in all four easements it seeks to use at Sequoyah would be a taking *per se.* Placement of cable or conduit in or along an easement is plainly a physical occupation of the easement space. And it matters not that the actual area occupied by Media General's cables would be small in comparison with the whole of Sequoyah's common areas; even so, a taking would still occur because "constitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied." *Loretto,* 458 U.S. at 436–37, 102 S.Ct. at 3176–77. Equally plain is the permanency of this physical occupation. So far as the record discloses, Media General intends to occupy these easements indefinitely into the future, presumably as long as the term of the easement. For three of the four easements, this is forever. The Virginia Power, C & P Telephone, and blanket utility easements grant perpetual rights to use the underlying land.[7] The Amsat easement is limited to the duration of Amsat's agreement with Sequoyah, which, although scheduled to expire in 1998, can be renewed without limitation. Under these circumstances, it is not unreasonable to view Media General's proposed occupation of this easement as potentially permanent.[8] But even if Media General's proposed occupation of the Amsat easement is limited to eight years, the application of the *Penn Central* multifactor analysis points persuasively to the conclu-

6. See *Loretto v. Teleprompter Manhattan CATV Corp.,* 53 N.Y.2d 124, 440 N.Y.S.2d 843, 853–57, 423 N.E.2d 320, 330–34 (1981), *rev'd,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

7. The Virginia Power easement deeds explicitly give the utility a "perpetual" easement over the land. The C & P Telephone and blanket utility easements, with no specific expiration dates or conditions, implicitly give their grantees perpetual easements.

8. In considering the difference between a permanent and a temporary occupation, Justice Marshall, for the *Loretto* majority, discussed several earlier cases. Referring to *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), he noted that no taking occurs where individuals solicit petition signatures on shopping center property in part because such occupation would be "temporary and limited in nature." *Loretto,* 458 U.S. at 434, 102 S.Ct. at 3175. And discussing *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), Justice Marshall noted that an "easement of passage, not being a permanent occupation of land, was not considered a taking *per se.*" 458 U.S. at 433, 102 S.Ct. at 3174. *See also City of St. Louis v. Western Union Tel. Co.,* 148 U.S. 92, 98, 13 S.Ct. 485, 487, 37 L.Ed. 380 (1893) (placement of telegraph poles along public streets constituted a permanent occupation, but the passage of an ordinary traveller was merely a "temporary, shifting use.") (quoted in *Loretto,* 458 U.S. at 428–29, 102 S.Ct. at 3172). Here, by contrast, Media General's use of the Amsat easement would be a constant physical occupation of land for at least eight years. Such an occupation is different from the temporary occupations cited in *Loretto;* those temporary occupations were fleeting, lasting only moments in the case of easements for passage and hours in the case of the *PruneYard* solicitors. Rather, Media General's constant occupation of easements at Sequoyah would more closely resemble the flooding cases the Supreme Court cited as examples of permanent occupations. *See, e.g., United States v. Lynah,* 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903).

sion that such use would be a taking. While the economic impact of Media General's access and its interference with distinct investment-backed expectations at Sequoyah would likely be small, the character of this physical invasion weighs the balance decidedly in favor of a taking. Government directed physical occupation for eight years deprives a property owner of the use of his land for a significant period of time. When coupled with the possibilities of renewal periods, this occupation rapidly approaches permanency. In sum, if the four easements in issue are private property, Media General's occupation of any of them requires just compensation.

Attempting to avoid this conclusion, Media General urges that authorization of access via voluntarily granted utility easements distinguishes the Act from *Loretto*. Access in *Loretto* was not via easements, but as the result of a state administrative proceeding that did not consider or award just compensation. This distinction does not rescue Media General's position from the effect of *Loretto*. In granting an easement, whether to a utility or not, the grantor gives the grantee, and no others, specific rights to use the underlying property. The Act, if it authorizes access via utility easements, essentially condemns space within these easements for use by the franchisee. This is an additional use of the easement not contemplated by the grantor or the grantee. *Loretto* teaches that such compelled access, if for a permanent physical occupation, is a taking *per se*.

Moreover, Media General has no valid support for its position; its reliance on *Centel Cable TV Co. v. Admiral's Cove Assocs.*, 835 F.2d 1359 (11th Cir.1988) is misplaced. In *Admiral's Cove Associates*, the panel, in dicta, noted that since most developers voluntarily grant easements to utilities, Congress could authorize cable franchisees to use these easements without creating a taking. In support, the panel cited the post-*Loretto* decision in *F.C.C. v. Florida Power Corp.*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987). 835 F.2d at 1363 n. 7.[9] But *Florida Power*, read closely, does not support this conclusion. There, the Supreme Court held that regulation of the rates utilities charge cable television companies to place their cables on the utilities' poles [10] did not amount to a taking. The Supreme Court noted the clear distinction between the facts before it and *Loretto*. In *Loretto*, the government mandated that the property owner permit the cable television franchisee to place its wires on the owner's property. In contrast, the utilities in *Florida Power* had voluntarily leased space on their poles to the cable companies. Thus, in *Florida Power*, a landlord-tenant relationship already existed. And, as the Supreme Court held, "statutes regulating the economic relations of landlords and tenants are not *per se* takings," but statutes mandating the physical occupation of an owner's property by "an interloper with a government license" are. *Florida Power Corp.*, 107 S.Ct. at 1112. Correctly understood, then, *Florida Power* stands for the limited proposition that, where a property owner voluntarily permits a cable franchisee on its property, Congress may regulate the rates the owner charges the franchisee. This limited proposition has no application to the facts at bar, which involve a taking not a voluntary landlord-tenant relationship. Notably, the Supreme Court in *Florida Power*, citing *Loretto*, explicitly reserved decision on the Pole Attachments Act's constitutionality in the event that act is subsequently applied to compel utilities to permit

---

**9.** For a direct application of this principle from *Admiral's Cove Associates* see *Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI*, No. 1:85–CV–3712–RCF (N.D.Ga. Sept. 28, 1989). *Cable TV Fund 14–A, Ltd. v. Property Owners Ass'n Chesapeake Ranch Estates, Inc.*, 706 F.Supp. 422 (D.Md.1989), also appears to decide that use of a utility easement does not constitute a taking. There, the district court granted a preliminary injunction to permit a franchised

cable company to install its cables in a subdivision using compatible utility easements. The court noted that the property owners association owned all the common areas, including the roads and byways, *id.* at 424, but the opinion is unclear whether or not the easements at issue had been dedicated to the public.

**10.** This regulation by the F.C.C. is authorized by the Pole Attachments Act, 47 U.S.C. § 224(b)(1).

franchisees access to utility poles and private easements. *See Florida Power Corp.*, 107 S.Ct. at 1112 n. 6. Distilled to its essence, Media General's position is that if a landowner encumbers his property by permitting any other party, not just a utility, to use it in a manner compatible with construction of a cable franchisee's system, the Act authorizes access by cable franchisees. After *Loretto*, such degradation of private property rights, including private easements, is impermissible. Accordingly, to the extent the easements at Sequoyah are private property, Media General's construction of its system through those easements pursuant to the Act would constitute a taking for which just compensation would be required.

## II

■ If the placement of Media General's cables along a private easement would constitute a taking, the question then presented is whether the Act authorizes such a taking. It does not. More specifically, the Act's legislative history demonstrates that (1) Congress did not intend the Act to authorize a taking; (2) the Act does not provide just compensation for a taking; and (3) Congress intended § 621 to do no more than authorize a franchisee to use public lands, namely public rights-of-way and easements that have been dedicated to public use.

Legislative history reflects that Congress, reviewing an early draft of the Act, expressly considered mandating access by authorizing a taking in circumstances identical to those at bar. As originally drafted, § 633 would have required mandatory access for a cable franchisee to serve, among others, "the owner of a unit within a condominium apartment building or other residential complex," despite the opposition of the owner of the surrounding common areas.[11] *See* H.R.Rep. No. 934, 98th Cong., 2d Sess. 80 (1984), *reprinted in* U.S.Code Cong. & Admin.News 4655, 4717 (1984). Specifically to address *Loretto*, and thereby ensure the mandatory access provision's constitutionality, Congress included two additional provisions in § 633 directly addressing just compensation for the taking. *See* H.R.Rep. No. 934 at 80–81, 1984 U.S. Code Cong. & Admin.News at 4717–18. Section 633(b)(1)(D) required that state franchising authorities or the FCC regulate just compensation determinations, and § 633(d) set forth factors to be considered in determining this just compensation, including: (1) the extent of physical occupation, (2) the long-term damage, (3) extent of interference with normal use and enjoyment of the property, and (4) the enhancement of the property's value from the

---

**11.** That version of § 633 provided, in pertinent part:

(a) The owner of any multiple-unit residential or commercial building or manufactured home park may not prevent or interfere with the construction *or installation of facilities necessary for a cable system*, consistent with this section, if cable service or other communications service has been requested by a lessee or owner ... of a unit in such building or park.

(b)(1) A State or franchising authority may, and *the Commission shall, prescribe regulations* which provide—

(A) that the safety, functioning, and appearance of the premises and the convenience and safety of other persons not be adversely affected by the installation or construction of *facilities necessary for a cable system;*

(B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both;

(C) that the owner be justly compensated by the cable operator for any damages caused by

the installation, construction, operation, or removal of such facilities by the cable operator; and

(D) methods for determining just compensation under this section.

\* \* \* \* \* \*

(d) In prescribing methods under subsection (b)(1)(D) for determining just compensation, consideration shall be given to—

(1) the extent to which the cable system facilities physically occupy the premises;

(2) the actual long-term damage which the cable system facilities may cause to the premises;

(3) the extent to which the cable system facilities would interfere with the normal use and enjoyment of the premises; and

(4) the enhancement in value of the premises resulting from the availability of services provided over the cable system.

H.R. 4103, 98th Cong., 2d Sess. § 633 (1984), *reprinted in* H.R.Rep. No. 934, 98th Cong., 2d Sess. 13 (1984).

availability of cable. *See* H.R. 4103, 98th Cong., 2d Sess. § 633 (1984), *reprinted in* H.R.Rep. No. 934, 98th Cong., 2d Sess. 13 (1984). As initially drafted, therefore, the Act not only unambiguously required that a franchisee be given access, but also explicitly provided just compensation for the concomitant taking. Ultimately, however, Congress rejected this mandatory access provision and deleted § 633 from the Act. Several provisions were transferred to the present § 621(a)(2),[12] but the key just compensation provisions, § 633(b)(1)(D) and § 633(d), were excised. The meaning of this deletion is unmistakable; just as Congress had carefully included these provisions to make clear, in light of *Loretto*, that the Act authorized a constitutional taking, so, too, must the deliberate deletion of the provisions mean that the Act, as enacted, no longer authorizes a taking. For without the § 633 just compensation provisions, the Act lacks any means to provide property owners just compensation for a taking.

The only enacted provision that could possibly suffice in this regard is § 621(a)(2)(C). It states:

[I]n using such easements the cable operator shall ensure

.   .   .   .   .

(C) that the owner of the property be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of such facilities by the cable operator. 47 U.S.C. § 541(a)(2)(C). Arguably, this language might be broad enough to include just compensation for a taking of private property. But again, the Act's legislative history refutes this argument. In the original version of the Act, § 621(a)(2)(C) coexisted, as § 633(b)(1)(C), in the original draft with the just compensation provisions, § 633(b)(1)(D) and § 663(d).[13] Their subsequent excision demonstrates that

§ 621(a)(2)(C) does not cover takings, but is limited to compensation for any property damage that may occur as a result of placing cables in eligible easements. Had Congress intended the current § 621(à)(2)(C) to provide just compensation for a taking, it would doubtless have left the excised § 633 takings provisions in place, as they governed the actual calculation of just compensation. Given Congress's concern with *Loretto*, § 621(a)(2)(C)'s retention without additional provisions detailing the determination of just compensation is persuasive, if not conclusive, evidence that § 621(a)(2)(C) concerns only property damage, not the taking of private property.

The conclusion that the Act neither authorizes a taking nor provides just compensation is further confirmed by the juxtaposition in the earlier draft of the present § 621 and the § 633 mandatory access provision. Simply put, this juxtaposition reflects that, as originally drafted, both § 621 and § 633 stood alone and provided two distinct rights of access: § 621 authorized access over public lands; § 633 authorized mandatory access to multi-unit buildings over public or private property. In this earlier version, § 633 did not reference § 621 at all. A franchisee's mandatory access right under § 633 was not constrained to similar-type utility easements, as it was under § 621. And because § 633 provided for a taking, access could have been had through private or public property by any means that ensured "the safety, functioning, and appearance of the premises." H.R. 4103 at § 633(b)(1)(A) *reprinted in* H.R.Rep. No. 934 at 13. By contrast, a franchisee's § 621 right of access was much narrower. It was not mandatory, but rather depended on, and was limited to, "public rights-of-way" or "easements … which have been dedicated for compatible uses." Significantly, however, § 621 did not authorize a taking of private property, for while it incorporated subsections

---

**12.** In the earlier draft, § 621(a)(2) incorporated its present subsections (A), (B), and (C) by reference to § 633, where they were set out in full as subsections (b)(1)(A), (B), and (C). When § 633 was deleted, these subsections were transferred to § 621. *Compare* H.R. 4103 § 621(a)(2) and

§§ 633(b)(1)(A), (B), and (C), *reprinted in* H.R. Rep. No. 934 at 6, 13 (earlier version) *with* 47 U.S.C. §§ 541(a)(2)(A), (B), and (C) (enacted version).

**13.** *See supra* note 12.

633(b)(1)(A), (B), and (C), it did not incorporate § 633(b)(1)(D), the provision for determining just compensation. This failure to incorporate the just compensation calculation provisions, while incorporating other regulatory provisions from the same section in the same draft, is virtually conclusive evidence that Congress never intended § 621 to permit a taking. As § 621 is identical today as it was then, the Court concludes that this provision permits a cable franchisee access only over public lands.[14]

■ In summary, therefore, this Court agrees with those decisions holding the Act (1) does not provide just compensation for a taking, *see Cable Investments, Inc. v. Woolley,* 867 F.2d 151, 160 (3d Cir.1989) (dicta), and (2) does not provide access through private easements, *see Cable Assocs., Inc. v. Town & Country Mgmt. Corp.,* 709 F.Supp. 582, 584–85, 589 (E.D. Pa.1989). By deleting § 633, Congress specifically rejected a mandatory right of access over private property for cable television franchisee's to provide their services. Owners of private property, including owners of private easements, are not compelled by the Act to grant franchisees access to their land or easements. Access pursuant to the Act may be had only through public rights-of-way or easements that have been dedicated to the public use.

The Court is mindful that some courts have reached contrary results. Several have held that § 621 does provide just compensation for a taking. *See Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI,* 678 F.Supp. 871 (N.D.Ga. 1986); *Rollins Cablevue, Inc. v. Saienni Enters.,* 633 F.Supp. 1315 (D.Del.1986); *Greater Worcester Cablevision, Inc. v. Carabetta Enters.,* 682 F.Supp. 1244 (D.Mass.1985). The Court finds these cases unpersuasive as they either do not

address the deletion of the mandatory access provision, § 633, or are silent as to the relationship between the present § 621(a)(2)(C) and the deleted just compensation provisions, § 633(b)(1)(D) and § 633(d). In sum, the current § 621, unlike the deleted § 633, does not authorize a taking of private property. Instead, it mandates franchisee access only to public rights-of-way and dedicated easements. Section 621 only provides compensation to affected property owners for any damages franchisees cause to property through the installation of their cable television systems.

### III

■ Application of this analysis to the facts at bar compels the conclusion that Media General is not entitled to access to Sequoyah under the Act. This is so because all the easements in issue are conveyances between or among private parties; none has been dedicated to the public; none is a public right-of-way.

■ The law of dedication is well settled in Virginia. Dedication of a property interest occurs only when the owner unequivocally offers that interest to a public entity for public use and that entity unequivocally accepts it. In the words of the Supreme Court of Virginia,

[At common law] [d]edication is an appropriation of land by its owner for the public use. It may be express or implied.... Dedication is not required to be made by a deed or other writing, but may be effectually and validly done by verbal declarations. The intent is its vital principle, and the dedication may be made in every conceivable way that such intention may be manifested. It must, however, be manifested by some unequivocal act, and is not effectual and

---

**14.** Moreover, the language Congress chose to define the § 621 access right supports this conclusion. Access is limited to *"public* rights-of-way ... easements ... which have been *dedicated* for compatible uses." 47 U.S.C. § 541(a)(2) (emphasis added). Dedication, as set out more fully in Section III below, is a conveyance by a grantor of certain rights in property to the public. Thus, the very words Congress used limit

access under § 621 to public lands. *See Cable Assocs., Inc. v. Town & Country Mgmt. Corp.,* 709 F.Supp. 582, 584–85, 589 (E.D.Pa.1989) ("dedication" is a legal term of art and Congress assumed to understand its meaning when including it in the Act). Media General's right, therefore, to access customers at Sequoyah is limited to public rights-of-way or easements that have been dedicated to the public use.

binding until accepted. When the intention of the owner to make the dedication has been unequivocally manifested, and there has been acceptance by competent authority ... the dedication is complete. *Greenco Corp. v. City of Virginia Beach*, 214 Va. 201, 198 S.E.2d 496, 498 (1973) (quoting *Buntin v. Danville*, 93 Va. 200, 24 S.E. 830, 830–31 (1896)). In addition to common law offer and acceptance, dedication may also occur through strict compliance with certain statutes. *Cf.* Va.Code Ann. § 15.1–478 (Repl.Vol.1989) (example of statutory dedication provision). Either acceptance at common law or strict statutory compliance is necessary because, upon dedication, the government becomes responsible for the property's maintenance and for any tort liability attributable to it. *See Brown v. Tazewell County Water & Sewerage*, 226 Va. 125, 306 S.E.2d 889, 892 (1983); *Ocean Island Inn v. City of Virginia Beach*, 216 Va. 474, 220 S.E.2d 247, 250 (1975).

None of the easements in issue has been dedicated to the public. Since no statute addresses the dedication of utility easements,[15] dedication could only have occurred through common law offer and acceptance. But the record is devoid of any language or actions from which an intent either to offer or to accept a dedication could be inferred. The language in the deeds neither explicitly nor implicitly demonstrates an intention to dedicate any of the easements to the public. Moreover, no act of a grantor manifests an intent to dedicate, nor does any act of a cognizant public body establish an acceptance. And nothing on the present record demonstrates that any government entity is responsible for maintaining these easements or would be accountable for any tort liability incurred.

A review of the facts in *Burns v. Board of Supervisors*, 226 Va. 506, 312 S.E.2d 731

(1984) is instructive. There, the Supreme Court of Virginia held that a subdivision's easements for sewer and water lines had been dedicated to the public use. But in contrast to the case at bar, the subdivision's developers in *Burns* had specifically recorded deeds of dedication with the subdivision's plats. These deeds provided, in part, that the developers " 'hereby dedicate the storm sewer, sanitary sewer and water line easements to the public use.' " 312 S.E.2d at 733. This offer of dedication was subsequently accepted by the cognizant county officials when they approved the plats before recordation. 312 S.E.2d at 736. No similar language or actions appear in the facts at bar. Accordingly, the Court concludes that none of the four easements in question is dedicated for a public use. Media General, therefore, is not entitled under the Act to use any of these easements to serve potential customers at Sequoyah.

### IV

The Court's conclusion that the Act permits a franchisee to obtain access only through public rights-of-way or easements dedicated to the public use does not render the Act a nullity. Franchisees may still seek access through such public rights-of-way as road beds and any easements that have been dedicated. As demonstrated in *Centel Cable Television Co. v. Burg & Divosta Corp.*, 712 F.Supp. 176 (S.D.Fla. 1988), such access is available in certain situations, particularly in developments where individual lots abut a public right-of-way. In *Burg & Divosta*, a developer barred a local franchisee from installing its system during construction of a subdivision, while at the same time permitting a developer-owned cable company to wire the subdivision. The court granted a preliminary injunction to permit the barred franchisee to install its cables along public rights-of-way and easements that had been

---

**15.** Neither § 15.1–478 of the Code of Virginia nor § 101–2–6(d)(4) of the Code of the County of Fairfax are apposite to the dedication of utility easements. Both the statute and the ordinance transfer to the County those portions of an approved, recorded subdivision plat set apart for streets, alleys, and easements that create a

public right of passage. Thus, these provisions are limited to "easements of rights-of-way for surface ingress and egress, rather than to easements for subsurface installation and maintenance of public utility facilities." *Burns v. Board of Supervisors*, 226 Va. 506, 312 S.E.2d 731, 736 (1984).

dedicated to public use in the subdivision's plat. Presumably, once the franchisee's system was installed in the dedicated easements, individual lot owners whose lots bordered on the easements could authorize connections to their property at some future time. *Burg & Divosta* clearly shows that the Act, as interpreted by this Court, is not a nullity.

In conclusion, Media General cannot rely on the Act to compel access to private utility easements in order to reach individual unit owners at Sequoyah.[16] These easements are the private property of the grantors, or their successors, and the grantee utilities. The Act does not authorize a taking of this private property, nor does it provide just compensation for such a taking. Congress has made a deliberate decision not to mandate access in situations like this. Accordingly, Media General may seek access under the Act only via public rights-of-way or through easements that have been dedicated for a public use.

An appropriate Order will enter.

---

16. Only the right under the Act to compel access to existing utility easements is in issue here. Not in issue is whether Virginia Power or C & P Telephone, pursuant to the rights granted them in their easements could authorize Media General to construct its system. Nor is the issue of Media General's private rights, if any, under the blanket utility easement before the Court.