In re TSC EXPRESS CO., Debtor.

**L. Lou ALLEN, Trustee for TSC Express Co., Plaintiff,**

v.

**NATIONAL ENQUIRER, INC., Defendant.**

**Bankruptcy No. 91–69474.
Ad. No. 93–6290.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Aug. 14, 1995.

John C. Pennington of Wilson, Strickland & Benson, Atlanta, GA, for Trustee/Plaintiff.

David K. Whatley of White, Smith, Howard & Ajax, Atlanta, GA, for Defendant/Debtor.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR STAY OF PROCEEDINGS

JAMES E. MASSEY, Bankruptcy Judge.

Following deregulation of the trucking industry, common carriers bowed to intense competition and negotiated rates with customers far below those on file with the Interstate Commerce Commission ("ICC").[1] Not a few carriers rode negotiated rates to ruin. TSC Express Co. appears to be one of them.

The wide-spread practice of negotiating rates violated the "filed rate" doctrine, which holds that carriers in interstate commerce must collect, and their shippers must pay, the published rates or tariffs filed with the ICC. 49 U.S.C.A. § 10761. *See Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Relying on that doctrine, TSC's Bankruptcy Trustee, L. Lou Allen, sued National Enquirer, Inc., one of TSC's customers, for the difference between TSC's published rates and the unfiled rates it negotiated with the Defendant for shipments delivered prior to 1990. There is no dispute that National Enquirer paid TSC the negotiated rates for the transportation services provided to it by TSC.

National Enquirer filed a counterclaim in which it contends that the filed rates are unreasonable and that it has a right to recoup the difference between those tariffs and reasonable rates. The Trustee moves for partial summary judgment, contending that she is entitled to judgment now, regardless of the merits of the Defendant's counterclaim.

Subsequent to the creation of the claims that are the subject of this dispute, Congress enacted the Negotiated Rates Act of 1993 ("NRA"), Pub.L. 103–180, 107 Stat. 2044. Section 2(e)(1) of the NRA provides in part:

> For purposes of section 10701 of title 49, United States Code, it shall be an unreasonable practice for a motor carrier of property ... to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable rate that is lawfully in effect pursuant to a tariff that is filed in accordance with chapter 107 of such title by the carrier or freight forwarder applicable to such transportation service and the negotiated rate for such transportation service if the carrier or freight forwarder is no longer transporting property

---

1. *See* Wayne Johnson, *Negotiated Rates Act of 1993: Congress Curtails Undercharge Litigation In Bankruptcy By Amending The Filed Rate Doctrine*, 68 Am.Bankr.L.J. 319, 331–341 (1994) (discussing deregulation legislation and its aftermath).

between places described in section 10521(a)(1) of such title or is transporting property between such places described in section 10521(a)(1) of such title for the purpose of avoiding the application of this subsection.

TSC is no longer in business. Section 10701 of title 49 makes unreasonable practices described in that section defenses to claims made pursuant to 49 U.S.C. § 10761 and 10762. Under section 2(e)(2) of the NRA, the ICC is given jurisdiction to determine whether or not attempting to charge or charging a particular rate is an unreasonable practice under section 2(e)(1).

National Enquirer moves for a stay of this adversary proceeding case so that issues of rate reasonableness and unreasonable practices may be decided by the ICC. Through the affidavit of Michael Bange attached to National Enquirer's motion, it has made a prima facie showing that TSC's rates were unreasonable, requiring that the case be heard by the ICC. *Allen v. Limited Distribution Services, Inc. (In re TSC Express Co.)*, 159 B.R. 1010 (Bankr.N.D.Ga.1993); *Brizendine v. Southern Wipers, Inc.*, 144 B.R. 183 (Bankr.N.D.Ga.1992). National Enquirer also seeks a stay to litigate before the ICC issues concerning whether shipments are exempt from ICC regulation under 49 U.S.C. §§ 10526(a)(7) and 10528. The court agrees that such issues are better adjudicated in the first instance by the ICC. Finally, National Enquirer seeks to litigate before the ICC the issue of unfair practices under the NRA.

In response to National Enquirer's motion and in support of her own motion for summary judgment, the Trustee makes three arguments. First, she contends that the NRA by its terms does not apply to this case. Second, she contends that the NRA is not retroactive. Third, she contends that the NRA, if applied retroactively, would be unconstitutional.

A. *Applicability of the Negotiated Rates Act.*

■ Section 9 of the NRA provides in part that "[n]othing in this Act ... shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; ...." The Trustee quotes correspondence between two members of Congress and a congressional committee report for the proposition that section 9 of the NRA was a compromise that proscribes application of the NRA to the extent that it would affect assets of a bankruptcy estate. The Trustee points out that the claim against National Enquirer at the commencement of the case was property of the estate under section 541(a) of the Bankruptcy Code. She notes that under section 704, a trustee is charged with collecting and reducing such property to money. Her argument, reduced to its essence, is that any relaxation of the filed rate doctrine has to affect the application of title 11 because the estate's assets would have greater value if the carrier and the shippers had to use the higher filed rates. She reasons that if the NRA applied here, an asset that existed at the commencement of the case would disappear so that she would be unable to do her job. To that extent, she concludes, the NRA would adversely affect an asset of the estate and thus would affect the application of title 11 within the meaning of section 9 of the NRA.

■ The Trustee misreads section 9 on two levels. First, the words "limiting or otherwise affecting application of title 11" are not ambiguous. These words rather plainly indicate that the NRA is not meant to alter substantive bankruptcy law or procedure set forth in title 11 of the U.S.Code when a trucking company files a bankruptcy petition.

The Trustee reads these words much more broadly to mean that application of the NRA to a case under title 11 is prohibited if its application would produce a different outcome of a dispute concerning what a shipper owes the bankrupt carrier. The claim for compensation for services rendered would be worth less than it would otherwise be, thus affecting a title 11 case.

The NRA doesn't refer to cases or assets, however. It refers only to the application of title 11. Nothing in the NRA proscribes or alters the application of title 11 to the reorganization or liquidation of trucking companies. The NRA may affect the value of a

claim for performing transportation services, but it does not alter the manner in which substantive and procedural rules making up title 11 are applied in administering that asset.

■ Under the Trustee's reasoning, Congress intended to bestow NRA defenses only on customers of those trucking companies that are not debtors in title 11 cases. What creditors and equity holders would be foolish enough to fail to act on their economic interests and not cause a title 11 case to be commenced? Hence, under the Trustee's reading, the statute would serve no purpose because it would rarely, if ever, be applied. The legislative history makes it plain that the statute was enacted to deal with the thousands of cases filed by motor carriers no longer in business. H.Rep No. 359, 103rd Cong., 1st Sess. 4 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2534. ("The purpose of [the NRA] is to provide a statutory process for resolving disputes for claims ... brought about by trustees for non-operating motor carriers for past transportation services.") The point of the NRA is to create defenses to overcharge claims that did not previously exist. To employ the Trustee's reasoning would be to ignore the plain directive of Congress.

■ On a different level, the Trustee's contention that the NRA affects application of title 11 because it affects the value of an asset is flawed because it assumes incorrectly that attributes of an asset, such as value, are fixed at the commencement of a bankruptcy case. A trustee and an estate take property of the debtor as they find it. Bankruptcy does not alter, enhance or diminish that property. *Matter of Sanders,* 969 F.2d 591, 593 (7th Cir.1992) "... a bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition.... Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest." Hence, if a change in a law or regulation might affect an asset's value, the mere filing of a title 11 case does not freeze that value by freezing the legal or regulatory environment that existed immediately prior to filing.

The estate takes the asset subject to the possibility of changes in laws and regulations that might affect value as if the case had never been filed.

B. *Application of The NRA To This Case.*

■ The Trustee argues that section 2(e) of the NRA does not apply here because the NRA is not retroactive. It is plainly retroactive in the sense that it applies to transportation services provided before September 30, 1990. It also makes collection of a so-called "undercharge" claim on behalf of a defunct carrier an unreasonable practice. Thus, the statute covers the claims of the Trustee in this case.

C. *Constitutionality.*

The Trustee argues that the NRA is arbitrary and effects a denial of equal protection of the law. She contends that TSC had a "vested" property right when TSC's bankruptcy case was filed and that the NRA deprives TSC and the estate of that property without due process. She asserts that retroactive application of the NRA violates the estate's due process rights. Finally, she contends that the NRA violates the doctrine of separation of powers. None of these arguments has merit.

■ 1. *Arbitrariness and Equal Protection.* The Trustee contends that the choice of September 30, 1990 as a cut-off date makes the NRA arbitrary, but she does not say why. The point of the NRA was to provide defenses to claims for the difference between filed rates and negotiated rates. Congress had to define the claims to which the NRA would apply, and one way to do that was to refer to the dates on which the claims arose. The Trustee makes no case that a different date would be rational but that the date selected was not. Congress may have believed, for example, that an earlier date would have left too much litigation pending in district and bankruptcy courts on issues that it wanted resolved in the first instance by the ICC in accordance with the NRA's provisions. Hence, the court is not persuaded that the choice of September 30,

1990 was an arbitrary or irrational exercise of power.

Contending that the NRA denies the Debtor's estate equal protection of law, the Trustee states the NRA "zeroes in on a particular class of claimants." But, she never articulates how the NRA discriminates against a class in which TSC or its estate is a member. Indeed, she never actually identifies the class.

TSC could hardly complain that it is being subjected to invidious discrimination by being bound to accept the rates it voluntarily negotiated. The Trustee stands in its shoes. The contention that the NRA discriminates against carriers no longer in business, if that is her argument, lacks merit because Congress could reasonably have concluded that the reasons underlying the need for the filed rate doctrine do not apply to defunct carriers. If the Trustee has some other argument about equal protection, she has failed to raise it or to offer facts to support it.

2. *Due Process Taking.* In contending that the NRA effects a due process "taking," the Trustee argues that it deprives the estate of a "vested" property right, one resulting from "reasonable investment backed expectations." Evaluation of the Trustee's contention that the NRA unconstitutionally takes property from TSC's estate begins with an analysis of the nature of the property right. Generally, TSC and its bankruptcy estate have a property right to unpaid claims against shippers for services rendered. The NRA does not deprive the estate of those claims, but it may arguably affect how they are valued.

Under the filed rate doctrine, the shipper is bound to pay the filed rate. TSC seeks to recover on a contract for the delivery of goods, one term of which would be supplied by the application of the filed rate doctrine. The NRA would no longer require payment of the filed rate but would instead leave the parties with the rates they negotiated. That change in the law reduces the value of the contract to TSC. It is that reduction in value that the Trustee complains about.

To put the problem in context, consider the nature of the "value" that the NRA might take away. The filed rate doctrine permits carriers like TSC to publish any rate that they desire. The government does not dictate the rate; rather, it demands only that the rate be filed and that, if challenged, it be reasonable. So, the value of the claim to payment for services performed was solely within the control of TSC.

It is also significant that the Trustee has not and presumably cannot show TSC would have received the tariff premium. The competitive environment in which TSC operated would not have permitted it to file and charge rates higher than those it negotiated. At least the Trustee has made no contention that TSC could have negotiated and collected the filed rates. Hence, the Trustee is asserting a property right in receiving compensation that TSC could not have received. It is ironic that litigants and courts have consistently referred to such claims as "undercharge" claims, when they are in fact "overcharge" claims, windfalls, claims for that which never existed.

Consider further what the NRA does not take away. The NRA does not take property of the Debtor for a public purpose. It does not bar TSC or its bankruptcy estate from recovering on any contract it made. Similarly, it would not prevent the Trustee from bringing a claim to avoid a fraudulent transfer, if the negotiated rate was so far below market as to effect a fraudulent transfer.

The court concludes that the nature of the excess value of the filed rate over the negotiated rate is not a true measurement of the value of the claim for services but rather is a penalty extracted from the shipper to enforce a policy unrelated to the protection of the trucker. The payment of the penalty to the trucker is gratuitous and does not bestow any property right in the trucker until the penalty is actually paid.

In *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), the Supreme Court referred to the frustration of "reasonable investment-backed expectations" as the touchstone in determining whether a

prohibited taking of property had occurred. The Trustee has produced no evidence that TSC in fact had any expectation that the filed rate doctrine would not be abandoned or that it invested a nickel in the belief that customers would ultimately have to pay the filed rates. She produced no evidence that TSC transacted with the Defendant in anticipation of collecting the windfall rate. To have anticipated such a result, TSC's principals would have to admit that they intended from the beginning to pull the rug out from under the feet of shippers, a highly dubious scheme even if somehow technically legal.

TSC could not have had a reasonable expectation that the regulatory environment would not change so as to eliminate "overcharge" claims by carriers no longer in business. The filed rate doctrine was put in place to protect railroads and the ICC's regulatory power over them, not the right of truckers to collect filed rates.[2] Where would such an expectation of its continued existence come from, when the purpose of the regulatory scheme was not to protect the carrier? Not the ICC. Not the courts, at least until *Maislin*. *See Jones Truck Lines, Inc. v. Whittier Wood Products Co.*, 57 F.3d 642, 650–51 (8th Cir.1995).

Even if it were decided that the expectancy of a windfall or the nature of the contract between trucker and shipper under the filed rate doctrine demonstrated the existence of a property right, the application of the NRA does not take that right in violation of the due process clause of the Fifth Amendment to the Constitution. Unlike the case in which a regulation reduces the utility of property to such an extent that it is rendered valueless, this case involves the repeal of a regulation that imposed an artificial value.

In *F.C.C. v. Florida Power Corp.*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987), Florida Power Corp., a utility, appealed from an order of the Federal Communications Commission under the Pole Attachments Act, 47 U.S.C. § 224, that set a lower rate which the utility could charge cable television companies using its poles than the rate embodied in contracts between Florida Power and the cable companies. Florida Power contended that the abrogation of the higher rates in the contracts constituted a taking of its property without due process. The Supreme Court disagreed, stating,

The remaining question, whether under traditional Fifth Amendment standards the challenged FCC order effected a taking of property, is readily answered. It is of course settled beyond dispute that regulation of rates chargeable from the employment of private property devoted to public uses is constitutionally permissible. *See Munn v. Illinois*, 94 U.S. [4 Otto] 113, 133–134, 24 L.Ed. 77 (1877); *Permian Basin Area Rate Cases*, 390 U.S. 747, 768–769, 88 S.Ct. 1344, 1360–1361, 20 L.Ed.2d 312 (1968). Such regulation of maximum rates or prices "may, consistently with the Constitution, limit stringently the return recovered on investment, for investors' interests provide only one of the variables in the constitutional calculus of reasonableness." *Id.*, at 769, 88 S.Ct., at 1361. So long as the rates set are not confiscatory, the Fifth Amendment does not bar their imposition. *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 53, 56 S.Ct. 720, 726, 80 L.Ed. 1033 (1936); *see Permian Basin, supra*, 390 U.S., at 770, 88 S.Ct., at 1361.

. . . . .

**2.** The tremendous expansion of the trucking industry threatened both railroads and the ability of the ICC to regulate railroads as if they were monopolies. As explained by Professor Pierce,

Congress confronted a clear policy choice. It could either deregulate railroads, in recognition of the effects that trucking had in dissipating the monopoly power of railroads, or it could extend regulation to trucking in order to protect the ICC's power to regulate railroads. Not surprisingly, the 1935 Congress chose the second option. . . .

. . . [T]he rationale for extending regulation to trucking—protecting the ICC's power to reg-

ulate railroads as if they still had monopoly power—required the ICC to devise a regulatory regime that produced artificially high rates. Richard J. Pierce, Jr., *The Supreme Court's New Hypertextualism: An Invitation to Cacophony and Incoherence in the Administrative State*, 95 Colum.L.R. 749, 766–776 (1995) (footnote omitted) (discussing the history of the filed rate doctrine as applied to the trucking industry in connection the Supreme Court's statutory interpretation in *Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990)).

The rate imposed by the Commission in this case was calculated according to the statutory formula for the determination of fully allocated cost. App. to Juris.Statement of FCC 23a. Appellees have not contended, nor could it seriously be argued, that a rate providing for the recovery of fully allocated cost, including the actual cost of capital, is confiscatory. Accordingly, we hold that the FCC regulatory order challenged below does not effect a taking of property under the Fifth Amendment.

*F.C.C. v. Florida Power Corp.*, 480 U.S. at 253–54, 107 S.Ct. at 1112–13 (footnote omitted).

Here, the Trustee makes no contention that the negotiated rates did not fully compensate TSC for the cost of the services it performed. Conceivably, the difference between the negotiated rates and the cost of the service might have resulted in a loss for TSC. But, if so, the loss was not because Congress required TSC to incur costs by permitting its property to be used for public benefit, as in *Florida Power*. The loss would merely have been a function of inefficiencies in TSC's operations. Without a showing that the negotiated rates would be confiscatory of the value of TSC's investment in the delivery of transportation services to the Defendant, the refusal to pass on the windfall cannot be an unconstitutional taking of TSC's or the estate's property.

In summary, the NRA does not deprive TSC of property or lower the true value of the service it rendered; rather, the NRA ends the transfer of a penalty imposed on the shipper to the trucker. It ends regulation and the only reasonable expectation that TSC and every other trucking company affected by the NRA could have had is that a regulation of this sort may change and hence the game of pulling the rug out from under shippers might end before the rug can be pulled.

■■■■ 3. *Retroactivity.* Retroactive application of the NRA also poses no constitutional dilemma. The Supreme Court has defined the due process standard to be applied to retroactive economic legislation as follows:

Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches. . . . To be sure; . . . retroactive legislation does have to meet a burden not faced by legislation that has only future effects. . . . 'The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.' . . . But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729–30, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984), *quoting Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2893–94, 49 L.Ed.2d 752 (1976). The legislative purpose in making the NRA retroactive was to curtail "undercharge" (or, as this court views it, "overcharge") litigation that, in the judgment of Congress, was wasteful and did not further the purpose of the filed rate doctrine. Carrying on this sort of litigation is very expensive. As the defense and counterclaim in this case demonstrate, it is not simply a choice between enforcing the tariff or enforcing the negotiated rate. A filed rate is not enforceable if it is unreasonable. By applying the statute retroactively, Congress may rationally have sought to proscribe litigation over issues concerning the reasonableness of tariffs several years old, where the cost of litigation in many cases could exceed the amount at stake. The NRA bears a reasonable relationship to such a goal and the goal itself is rational.

■■■■ 4. *Separation of Powers.* Finally, in asserting that the retroactive application of the statute violates the constitutional principle of separation of powers, the Trustee misses the mark. Unlike the situation in *Plaut v. Spendthrift Farm, Inc.*, —— U.S. ——, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), the NRA does not require the reopening of a final judgment. The Court addressed the

very argument made by the Trustee in these words:

It is true, as petitioners contend, that Congress can always revise the judgments of Article III courts in one sense: When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly. *See United States v. Schooner Peggy,* 1 Cranch 103, 2 L.Ed. 49 (1801); *Landgraf v. USI Film Products,* 511 U.S. ——, —— — ——, 114 S.Ct. 1483, 1500–1508, 128 L.Ed.2d 229 (1994).

*Plaut,* —— U.S. at ——, 115 S.Ct. at 1457. In short, the Trustee has not identified any provision of the United States Constitution that the NRA as applied to this case would violate.

For these reasons, the National Enquirer's motion for a stay must be granted and the Trustee's motion for summary judgment must be denied.

It is therefore

ORDERED that the Trustee's Motion for summary judgment is DENIED. The Defendant's motion for a stay is GRANTED. The Defendant shall have three months from entry of this order within which to file the appropriate pleading with the ICC to raise the issue of the reasonableness of rates charged by TSC Express to the Defendant, the issue concerning whether shipments are exempt from ICC regulation under 49 U.S.C. §§ 10526(a)(7) and 10528, and all issues covered by section 2(e)(2) of the Negotiated Rates Act of 1993. If such a pleading is timely filed, this case is stayed for a period of two years thereafter. The parties are directed to advise the court within thirty days of any decision by the ICC and whether the parties then believe any issue remains for this court to decide. In the interim, this case is administratively closed.