United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 4, 2002 Decided December 20, 2002 

 No. 01-1326

 Southern Company Services, Inc., 
 Petitioner

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 United Telecom Council, et al., 
 Intervenors

 Consolidated with 
 01-1328, 01-1372, 01-1377, 01-1378, 01-1380

 On Petitions for Review of Orders of the 
 Federal Communications Commission

 -----------

 J. Russell Campbell argued the cause for petitioners. With 
him on the briefs were Andrew W. Tunnell, Eric B. Langley, 
Jennifer M. Buettner, Charles A. Zdebski, Shirley S. Fujimo-
to, Christine M. Gill, Thomas P. Steindler, Erika E. Olsen, 
Jill M. Lyon, Brett W. Kilbourne, and Laurence Brown. 
John D. Sharer entered an appearance.

 Gregory M. Christopher, Counsel, Federal Communications 
Commission, argued the cause for respondents. With him on 
the brief were Jane E. Mago, General Counsel, John E. 
Ingle, Deputy Associate General Counsel, Robert B. Nichol-
son and Robert J. Wiggers, Attorneys, United States Depart-
ment of Justice. John J. Powers III entered an appearance.

 Daniel L. Brenner, Neal M. Goldberg, David L. Nicoll, 
Thomas F. O'Neil III, William Single IV, Paul Glist, John 
D. Seiver, Geoffrey C. Cook, Brian M. Josef, and Anthony C. 
Epstein were on the brief for intervenors National Cable & 
Telecommunications Association, et al.

 Before: Edwards, Rogers, and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Edwards.

 Edwards, Circuit Judge: In this case, Southern Company 
Services along with a dozen owners of utility poles and 
conduits (collectively, "utilities" or "petitioners") petition this 
court for review of three Federal Communications Commis-
sion ("FCC" or "Commission") Orders implementing amend-
ments to the Pole Attachments Act (the "Act"), 47 U.S.C. 
s 224 (2000). Under the Act, the owners of poles and 
conduits have an obligation to lease space to companies that 
wish to "attach" cables or wires. The statute gives the FCC 
authority to "regulate the rates, terms, and conditions" in the 
market for attachment space and to "adopt procedures neces-
sary and appropriate to hear and resolve complaints" regard-
ing these matters. Id. s 224(b)(1). In the disputed Orders, 
the Commission announced regulations and procedures de-
signed to assure that telecommunications providers can ob-
tain the attachment space at just and reasonable rates.

 In July 1997, the FCC adopted a Notice of Proposed Rule 
Making ("NPRM") relating to the implementation of s 703(e) 

of the Telecommunications Act of 1996 to amend the Commis-
sion's rules and policies governing pole attachments. In the 
Matter of Implementation of Section 703(e) of the Telecom-
munications Act of 1996, Amendment of the Commission's 
Rules and Policies Governing Pole Attachments, Notice of 
Proposed Rule Making, 12 F.C.C.R. 11,725 (Aug. 12, 1997), 
reprinted in Joint Appendix ("J.A.") 297-326. In February 
1998, after notice and comment, the Commission announced 
rules governing reasonable rates for telecommunications at-
tachments and guidelines for nondiscriminatory access to 
poles and conduits. Implementation of Section 703(e) of the 
Telecommunications Act of 1996, Amendment of the Com-
mission's Rules and Policies Governing Pole Attachments, 
Report and Order, 13 F.C.C.R. 6,777 (Feb. 6, 1998), ("Tele-
com Order"), reprinted in J.A. 213-96. In March 1997, the 
FCC adopted a NPRM relating to the maximum just and 
reasonable rates utilities may charge for attachments made to 
a pole, duct, conduit or right-of-way. 12 F.C.C.R. 7,449 (Mar. 
14, 1997). In April 2000, following notice and comment, the 
Commission revised the methodology and application of the 
rate formula. Amendment of Rules and Policies Governing 
Pole Attachments, Report and Order, 15 F.C.C.R. 6,453 (Apr. 
3, 2000) ("Fee Order"), reprinted in J.A. 79-158. Finally, in 
May 2001, the FCC clarified and revised its two previous 
orders, answering petitions from interested parties in a con-
solidated proceeding. In the Matter of Amendment of the 
Commission's Rules and Policies Governing Pole Attach-
ments; In the Matter of Implementation of Section 703(e) of 
the Telecommunications Act of 1996, Consolidated Partial 
Order on Reconsideration, 16 F.C.C.R. 12,103 (May 25, 2001) 
("Reconsideration Order"), reprinted in J.A. 1-78.

 The utilities contend that the new rules exceed the FCC's 
enforcement authority and interfere with their rights to rea-
sonably deny pole, duct, conduit, and right-of-way space. 
Petitioners also claim that the rules betray the requirements 
of reasoned decision-making under the Administrative Proce-
dure Act ("APA").

 On the record presented, we find that the FCC Orders are 
premised on reasonable interpretations of the Act and that 

the disputed rules do not interfere with petitioners' rights to 
negotiate contracts or to deny space for legitimate reasons. 
Certain of the disputed rules are unripe for review, so we 
offer no judgment on them. We otherwise hold that, in 
promulgating the disputed Orders, the FCC took into account 
the relevant factors, provided reasoned explanations for its 
decisions, and grounded its justifications in record evidence. 
Accordingly, we reject petitioners' claim that the rules are 
"arbitrary, capricious or contrary to law," and hereby deny 
the petitions for review.

 I. Background

 In 1978, Congress enacted the Pole Attachments Act to 
curb anti-competitive tendencies that limited the growth of 
the communications market. Pub. L. No. 95-234, 47 U.S.C. 
s 224 (1978); see also Nat'l Cable & Telecomm. Ass'n, Inc. v. 
Gulf Power Co., 534 U.S. 327, 330 (2002); FCC v. Fla. Power 
Corp., 480 U.S. 245, 247-48 (1987). The then-nascent cable 
industry relied heavily upon the space on utility poles to 
secure the wires that delivered the signals to consumers. 
Since building new poles was prohibitively expensive, cable 
operators instead leased existing space from utilities (usually 
electricity and telephone service companies). Fla. Power 
Corp., 480 U.S. at 247 ("Utility company poles provide, under 
such circumstances, virtually the only practical physical medi-
um for the installation of television cables."). However, 
utilities often exploited their market position to charge exces-
sively high attachment rates. To restrain this practice, Con-
gress sought to "establish a mechanism whereby unfair pole 
attachment practices may come under review and sanction, 
and to minimize the effect of unjust or unreasonable pole 
attachment practices on the wider development of cable tele-
vision service to the public." S. Rep. No. 95-580 (1977) 
("Senate Report"), reprinted in 1978 U.S.C.C.A.N. 109.

 The original provisions in the Act gave the FCC authority 
to "regulate the rates, terms, and conditions" for attachment 
contracts and the authority to assure that such rates are "just 
and reasonable." 47 U.S.C. s 224(a) (1978). The Act defined 

a "pole attachment" as "any attachment made by a cable 
television system to a pole, duct, conduit or right of way 
controlled by a utility." Id. s 224(a)(4). Under the Act, the 
Commission could set rates ranging from no less than "the 
additional cost of providing the pole attachments" to no more 
than the share of the total operating expenses in proportion 
to the percentage of space on the pole occupied by the cable 
carrier. Id. s 224(d)(1); see also Fla. Power Corp., 480 U.S. 
at 248. The FCC's jurisdiction to enforce the statute applied 
in all places where state agencies had not previously adopted 
regulations. See Senate Report, 1978 U.S.C.C.A.N. at 110.

 Responding to the development of telecommunications 
technologies during the intervening years, Congress substan-
tially amended 47 U.S.C. s 224 in the 1996 Telecommunica-
tions Act, Pub. L. No. 104-104, 110 Stat. 56 (1997). The 
major changes in the Act reflect the view that telecommunica-
tions companies offering new services to the public should 
enjoy protections similar to those that the 1978 Act made 
available to the cable industry. See H.R. Conf. Rep. No. 
104-458 (1996), reprinted in 1996 U.S.C.C.A.N. 125. Con-
gress determined that expanding the Act's scope in this 
manner would ultimately improve telecommunications service 
options for consumers.

 Three specific changes in the Act are relevant to the 
present case. First, the amended statute broadens the defi-
nition of "pole attachment" to include connections made by 
cable operators or any other "provider of telecommunications 
service" to poles, ducts, conduits, or rights-of-way owned or 
controlled by a utility. 47 U.S.C. s 224(a)(4). The Act also 
calls on the FCC to develop a separate attachment rate 
scheme for telecommunications providers. Id. s 224(e). Fi-
nally, the Act requires owners to provide "non-discriminatory 
access" to attachers seeking space on poles, ducts, conduits, 
and rights-of-way. Id. s 224(f)(1). An owner may deny 
space "where there is insufficient capacity and for reasons of 
safety, reliability and generally applicable engineering pur-
poses." Id. s 224(f)(2).

 The contested issues in this case fall into four general 
categories. First, the Commission updated its formula for 
allocating the cost of "other than usable" (or "unusable") 
space. The Act directs that "[a] utility shall apportion the 
cost of providing space on a pole, duct, conduit, or right-of-
way other than the usable space among entities so that such 
apportionment equals two-thirds of the costs of providing 
space other than the usable space that would be allocated to 
such entity under an equal apportionment of such costs 
among all attaching entities." Id. s 224(e)(2). Thus, the 
maximum rate for any single attacher decreases as the total 
number of attaching entities grows. In the Reconsideration 
Order, the FCC announced that it would calculate the costs 
for unusable space based on the following definition:

 The term "attaching entities" includes, without limi-
 tation and consistent with the Pole Attachment Act, 
 any telecommunications carrier, incumbent or other 
 local exchange carrier, cable operator, government 
 agency, and any electric or other utility, whether or 
 not the utility provides telecommunications service 
 to the public, as well as any other entity with a 
 physical attachment to the pole.
 
Reconsideration Order at 12,133-34 p 59, J.A. 29 (footnote 
omitted). This position reversed the Commission's position in 
the Telecom Order that both municipal agencies and utilities 
with wires on the pole were subject to the "attaching entities" 
classification only if they provided telecommunications ser-
vices. Id. at 12,1332 p57, J.A. 28; see also Telecom Order at 
6,800-04 pp 48-54, J.A. 237-40. To aid in rate calculations, the 
Commission announced that poles located in areas with more 
than 50,000 people have a presumed average of five attachers, 
while poles located in areas with fewer than 50,000 people 
have a presumed average of three attachers. Reconsidera-
tion Order at 12,139-40 p 71, J.A. 35-36.

 Second, pursuant to s 224(e)(1), the FCC adopted a com-
plaint resolution process for situations "when the parties fail 
to resolve a dispute over [rate] charges." Under the applica-
ble rules, an attacher may "sign" a contract with a utility and 

later file a complaint with the FCC to contest an element of 
that agreement deemed to be unfair. Id.; Telecom Order at 
6,780-90 pp 16-21, J.A. 223-26; Reconsideration Order at 12,-
112 p 12, J.A. 8. This is the so-called "sign and sue" rule.

 Third, the Commission adopted regulations for overlashing, 
a technique whereby a telecommunications provider attaches 
a wire to its own (or, for third-party overlashing, to other 
attachers') existing wires. The FCC rule provides that a 
third-party overlasher "shares space with the host attach-
ment" and, therefore, does not qualify as an "attaching enti-
ty" for purposes of the attachment rate formula. Reconsider-
ation Order at 12,145 p 83, J.A. 41. This rule changed the 
position taken by the FCC in the Telecom Order. See 
Telecom Order at 6,809-10 pp 68-69, J.A. 245-46. The Com-
mission also clarified that an overlashing party does not need 
to obtain advance consent from a utility if that party has a 
primary wire attachment already in place. Reconsideration 
Order at 12,144-45 p 82, J.A. 40-41. The FCC recognized, 
however, that "a utility is entitled to notice of the overlash-
ing," and that the utility may recover any costs incurred for 
strengthening the pole to support the weight of additional 
wires. Id.

 Fourth, the FCC adopted rules concerning the rate formula 
for attachment space in conduits - the hollow underground 
structures that carry cables and telecommunications wires. 
In both the Fee Order and the Reconsideration Order, the 
Commission determined that conduits contain no unusable 
space. Id. at 12,149 p 93, J.A. 45; Fee Order at 6,496-97 
pp 89-90, J.A. 123. The Commission found that any conduit 
area that could be utilized for a specific purpose was "usable" 
and therefore was subject to the rate formula:

 [A]n electric utility is allowed to reserve capacity for 
 future business purposes under a bona fide business 
 plan, but must allow that capacity to be used for 
 attachments until an actual business need arises. 
 For whatever reason capacity may be reserved or 
 designated for special uses, by or on behalf of the 
 utility, and regardless of who may benefit directly or 
 
 indirectly from those uses, the capacity is available 
 for use and therefore remains part of the total 
 capacity of the conduit for rate determination pur-
 poses.
 
Reconsideration Order at 12,150 p 94, J.A. 46 (footnotes 
omitted). The FCC also adopted an administrative presump-
tion that each conduit attachment occupies only half the space 
within each duct (i.e., a subsection of the conduit). Id. at 
12,150 p 95, J.A. 46; Telecom Order at 6,829 p 115, J.A. 265-
66. Just as it found that its presumptions for the number of 
entities on a pole were rebuttable, the agency noted that any 
utility could offer data showing that specific attachments 
actually used a greater share of duct space. Id.

 II. Analysis

 Petitioners assert that the disputed rules and procedures 
should be vacated, because they violate the Act and betray 
the precepts of reasoned decision-making under s 706(2)(A) 
of the APA, 5 U.S.C. s 706(2)(A).

 In deciding whether to defer to the FCC's construction of 
the Pole Attachments Act, we adhere to the tests enunciated 
by the Supreme Court in Chevron U.S.A. Inc. v. Natural 
Resources Defense Council, Inc., 467 U.S. 837 (1984), and 
United States v. Mead Corp., 533 U.S. 218 (2001). In Chev-
ron, the Court held that, "[i]f the intent of Congress is clear, 
that is the end of the matter; for the court, as well as the 
agency, must give effect to the unambiguously expressed 
intent of Congress." 467 U.S. at 842-43. This is so-called 
"Chevron Step One" review. If Congress "has not directly 
addressed the precise question" at issue, and the agency has 
acted pursuant to an express or implicit delegation of authori-
ty, the agency's interpretation of the statute is entitled to 
deference so long as it is "reasonable" and not otherwise 
"arbitrary, capricious, or manifestly contrary to the statute." 
Id. at 843-44. This is so-called "Chevron Step Two" review. 
Mead reinforces Chevron's command that Chevron deference 
to an agency's interpretation of a statute is due only when "it 
appears that Congress delegated authority to the agency 

generally to make rules carrying the force of law, and that 
the agency interpretation claiming deference was promulgat-
ed in the exercise of that authority." Mead, 533 U.S. at 226-
27.

 In this case, there is no doubt that the FCC promulgated 
the new rules pursuant to congressionally delegated authority 
and that the disputed Orders purport to have the force of law. 
Petitioners contend, however, that certain provisions in the 
new rules exceed the Commission's authority under the Act. 
We reject this contention. The intent of Congress is not 
unambiguously expressed in the provisions of the Act at issue 
in this case. Nonetheless, the FCC's constructions of the Act 
are entirely reasonable and thus deserving of deference under 
Chevron Step Two.

 Petitioners also contend that, whether or not the new rules 
reflect permissible interpretations of the statute, they should 
be vacated as "arbitrary and capricious" under the APA. In 
Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. 
Co., 463 U.S. 29 (1983), the Supreme Court explained the 
APA's "arbitrary and capricious" test, as follows:

 The scope of review under the "arbitrary and capri-
 cious" standard is narrow and a court is not to 
 substitute its judgment for that of the agency. Nev-
 ertheless, the agency must examine the relevant 
 data and articulate a satisfactory explanation for its 
 action including a "rational connection between the 
 facts found and the choice made." In reviewing that 
 explanation, we must "consider whether the decision 
 was based on a consideration of the relevant factors 
 and whether there has been a clear error of judg-
 ment." Normally, an agency rule would be arbi-
 trary and capricious if the agency has relied on 
 factors which Congress has not intended it to consid-
 er, entirely failed to consider an important aspect of 
 the problem, offered an explanation for its decision 
 that runs counter to the evidence before the agency, 
 or is so implausible that it could not be ascribed to a 
 difference in view or the product of agency exper-
 
 tise. The reviewing court should not attempt itself 
 to make up for such deficiencies: "We may not 
 supply a reasoned basis for the agency's action that 
 the agency itself has not given." We will, however, 
 "uphold a decision of less than ideal clarity if the 
 agency's path may reasonably be discerned."
 
Id. at 43 (citations omitted). As the Court makes clear, the 
scope of judicial review under this standard is narrow. Pur-
suant to this standard, we can find no basis for overturning 
the agency rules at issue in this case.

A. The Pole Space Rules

 The Act sets forth fairly general rules regarding allocations 
of the cost of usable and unusable space for attachments. See 
47 U.S.C. s 224(d), (e). As noted above, the rate for any 
single "attaching entity" varies inversely with the total num-
ber of attachers. Reconsideration Order at 12,131-32 p 55, 
J.A. 27-28. In applying the statute, the Commission's rules 
prescribe that any party with a physical attachment is an 
"attaching entity." Reconsideration Order at 12,133-34 p 59, 
J.A. 29. This means that even municipalities and utility 
owners themselves may be deemed "attaching entities." Pe-
titioners challenge this rule, claiming that the statute only 
allows telecommunications and cable companies to be counted 
as attaching entities.

 Petitioners' view of the statute is wrong. The specific 
provision at issue, 47 U.S.C. s 224(e)(2), merely says that the 
FCC must equally apportion costs "among all attaching enti-
ties." Petitioners argue, however, that the statutory defini-
tions of "pole attachment," s 224(a)(4), and "telecommunica-
tions carrier," s 224(a)(5), which do not include utilities and 
municipalities, show that Congress meant to exclude utilities 
and municipalities from the category of attaching entities. 
This argument fails, because the cited provisions do not 
establish what parties qualify as "attaching entities" for pur-
poses of apportioning costs under s 224(e)(2). In fact, to the 
extent the Act mentions "entities" at all, the term bears 
different meanings depending upon the context. Compare id. 

s 224(h) (describing obligations of an "owner" and "any enti-
ty" when either modifies a pole attachment), with id. s 224(i) 
(prohibiting charges to a party for attachment changes by 
"any other entity" including owners). The most that can be 
said is that s 224(e)(2) is unclear on whether utilities or 
municipalities count as "attaching entities" for purpose of 
apportioning costs.

 The FCC's decision to count utilities among "attaching 
entities" is an eminently reasonable interpretation of the 
statute. The FCC reasoned that its broader definition better 
reflects the operative language in the Act. Congress chose 
not to use a more specific term like "telecommunications 
carrier" or "provider of telecommunications services," which 
would have evidenced an intent to distribute the unusable 
space costs more narrowly. Reconsideration Order at 12,133-
34 p 59, J.A. 29-30. The broader definition is also justified 
because it limits the financial burden on telecommunications 
providers and therefore encourages growth and competition 
in the industry. Finally, the FCC noted that, absent the rule, 
a telecommunications provider might bear the entire cost of 
unusable space where it is the sole paying attacher. Id. at 
12,134 p 60, J.A. 30. In sum, the agency's interpretation of 
s 224(e)(2) is clearly a permissible interpretation of the stat-
ute to which we must defer.

 Petitioners complain that the FCC acted unreasonably 
when it "reversed course" in its Reconsideration Order, re-
moving all of the limitations that it had previously embraced 
for counting attaching entities in the Telecom Order. Com-
pare Reconsideration Order at J.A. 28-30 with Telecom Order 
at J.A. 236-40. But this reversal does not render the new 
rule infirm. Rather, the issue is whether the agency fur-
nished a reasoned explanation for its changed position. 
PSWF Corp. v. FCC, 108 F.3d 354, 357 (D.C. Cir. 1997); 
Greater Boston Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 
1970). There is no doubt in this case that the FCC's changed 
position was fully justified and reasonable. The same reasons 
that justify the agency's permissible interpretation of the 
statute justify its decision to change from a narrow to a 
broader definition of attaching entities. Reconsideration Or-

der at 12,133-34 pp 58-61, J.A. 29-30. As noted above, the 
FCC reasonably concluded that the broader definition better 
served the goals of the Act.

 Petitioners further claim that the FCC violated the Act and 
acted unreasonably in adopting presumptions for the number 
of attaching entities. The Reconsideration Order states:

 In order to expedite the process of developing 
 average numbers of attaching entities, and allow 
 utilities to avert the expense of developing location 
 specific averages, we provide two rebuttable pre-
 sumptive averages for use in our Telecom Formula. 
 This gives both small and large utilities the option of 
 not conducting a potentially costly and burdensome 
 exercise necessary to develop averages based on 
 their company specific records. The adoption of 
 presumptive averages should reduce cost and effort 
 by all parties.... 
 
 In the Telecom Order, we did not establish pre-
 sumptions, but said we believed the most efficient 
 and expeditious manner to calculate a presumptive 
 number of attaching entities would be for each utili-
 ty to develop its own presumptive average number 
 of attaching entities. We now reconsider that deci-
 sion and set rebuttable presumptive average num-
 bers of attaching entities for our two categories, 
 urbanized and non-urbanized. We are now persuad-
 ed that utilities and attaching entities would benefit 
 from our providing presumptive averages for their 
 use. Our establishment of presumptive averages 
 will expedite the process and allow utilities to avert 
 the expense of developing location specific averages. 
 As with all our presumptions, either party may rebut 
 this presumption with a statistically valid survey or 
 actual data.
 
Id. at 12,139 pp 69-70, J.A. 35 (footnotes omitted).

 The FCC's decision to use rebuttable presumptions is 
neither inherently unlawful nor facially unreasonable. We 

reject petitioners' suggestions to the contrary. However, 
because the FCC has yet to apply the presumptions, we have 
no basis upon which to judge the reasonableness of the new 
rules as applied. The presumptions are merely presumptions 
that are subject to rebuttal in any case. And, under the 
applicable rule, utilities are free to substitute their own 
surveys to establish more precise data on the numbers of 
attaching entities. Absent a live controversy regarding a 
particular application of the presumptions, petitioners' chal-
lenges to the presumptions as applied are unfit for review. 
Because the "institutional interests" of the agency and the 
court favor postponing review, and because petitioners have 
pointed to no "hardship" that will result from delaying review, 
we dismiss the as-applied challenges to the presumptions for 
want of ripeness. See City of Houston v. Dep't of Housing 
and Urban Dev., 24 F.3d 1421, 1430-32 (D.C. Cir. 1994).

B. The Overlashing Rules

 Petitioners contest the FCC's rules on overlashing on 
several grounds. First, they claim that the rules force utili-
ties to violate the Act's nondiscrimination provision, because 
they establish different norms for an overlashing entity and 
other attaching entities. Second, they contend that without a 
rule that overlashers give prior notice to utilities, owners 
cannot exercise their right to deny access for the reasons 
listed in the statute. Finally, they suggest that the FCC 
procedurally erred by ignoring their comments in drafting 
these rules. We find no merit in these claims.

 Because overlashing by definition involves a physical con-
nection to other wires and not to the pole itself, the Commis-
sion concluded that a utility is not entitled to charge overlash-
ing parties for pole space. Reconsideration Order at 12,142 
p 76, J.A. 38. This is a permissible construction of the 
statute, one that comports with the FCC's permissible con-
struction of "attaching entities."

 The overlashing rules allow utilities to charge overlashers 
"make ready" costs if the overlashing wires require enhancing 
the strength of the pole. Id. at 12,142 p 77, J.A. 38-39. And 
a utility can also deny access to overlashers for reasons of 

insufficient capacity, safety or reliability as described in the 
Act. See 47 U.S.C. s 224(f)(2); Reconsideration Order, at 
12,141 p 74, J.A. 37. Overlashers are not required to give 
prior notice to utilities before overlashing. However, the 
FCC rules do not preclude owners from negotiating with pole 
users to require notice before overlashing. Id. at 12,144 p 82, 
J.A. 41 ("We clarify that it would be reasonable for a pole 
attachment agreement to require notice of third party over-
lashing."). Whether, and to what extent, such a contract 
provision might be enforceable is a question not presently 
before us. Therefore, we have no occasion to decide that 
issue.

 In short, the overlashing rules show due consideration for 
the utilities' statutory rights and financial concerns. The 
record shows that these matters played a role in the FCC's 
decision, but petitioner's concerns were balanced with the 
efficiency gains that overlashing brings to the industry. See 
id. at 12,140-41 p 73, J.A. 36-37.

C. "Sign and Sue" Rule

 Petitioners also contend that the FCC's rule allowing enti-
ties to "sign and sue" violates the Act's plain meaning and is 
arbitrary and capricious. According to petitioners, attaching 
parties should be required to take exception to the terms and 
conditions of an agreement when the attachment agreement 
is negotiated or be estopped from filing a complaint about 
those terms after the agreement is executed. Petitioners 
argue that, under the Commission's rule, attachers can keep 
the benefit of their bargains as they see fit and simultaneous-
ly seek to avoid disfavored provisions. "The Commission's 
decision to play both negotiator and arbitrator, thus displac-
ing any true market negotiations, is unlawful," say petition-
ers. Petitioners' Br. at 37. We disagree.

 The Commission has a duty to "adopt procedures necessary 
and appropriate to hear and resolve complaints concerning 
such rates, terms, and conditions." 47 U.S.C. s 224(b)(1); 
see also id. s 224(e)(1) (directing FCC to establish regula-
tions to govern when "parties fail to resolve a dispute over 
such charges"). Complying with these statutory mandates 

gives the FCC jurisdiction to resolve contract disputes be-
tween the parties, save possibly where state regulations 
occupy the field. Id. s 224(c)(1).

 Petitioners' argument implicitly suggests that, under the 
disputed rule, the FCC seeks to retain unfettered authority to 
abrogate the lawful terms of private settlements merely at 
the behest of attachers. We see nothing in the rules to 
support this view. The agency's brief to this court aptly 
disposes of this issue:

 The utilities do not describe or explain under what 
 circumstances the Commission's condoning of "sign 
 and sue" undermines reliance on private negotiation 
 or when exactly it is unfair to the utilities, but we 
 observe that "sign and sue" is likely to arise only in 
 a situation in which the attacher has agreed, for one 
 reason or another, to pay a rate above the statutory 
 maximum or otherwise relinquish a valuable right to 
 which it is entitled under the Pole Attachments Act 
 and the Commission's rules. If the rates and condi-
 tions to which the attacher later objects are within 
 the statutory framework, then the utility has nothing 
 to fear from the attacher's complaint. The attacher 
 would not be entitled to relief.
 
 For example, one scenario in which "sign and sue" 
 is likely to arise is when the attacher acquiesces in a 
 utility's "take it or leave it" demand that it pay more 
 than the statutory maximum or relinquish some 
 other valuable right - without any quid pro quo 
 other than the ability to attach its wires on unrea-
 sonable or discriminatory terms. Of course the Pole 
 Attachments Act was designed to prevent such an 
 exercise of monopoly power that would nullify the 
 statutory rights of cable systems or telecommunica-
 tions carriers to obtain both immediate access and 
 timely regulatory relief to the extent access is unrea-
 sonable or discriminatory. The utility is statutorily 
 required to grant prompt, nondiscriminatory access 
 and may not erect unreasonable barriers or engage 
 
 in unreasonable delaying tactics. So in this scenar-
 io, where the utility gives nothing of value in ex-
 change for the attacher's coerced "agreement" to 
 accept unreasonable or discriminatory access, the 
 utility has no right to complain if the attacher "signs 
 and sues" to challenge this abuse of the utility's 
 monopoly control over the essential transport facili-
 ties.
 
 It is conceivable that in some circumstances, the 
 utility may give a valuable concession in exchange 
 for the provision the attacher subsequently chal-
 lenges as unreasonable. As a hypothetical example, 
 the utility might agree to absorb some of the make-
 ready or attachment costs that are normally paid by 
 the attachers in exchange for a higher rate. In that 
 situation, the Commission could evaluate the reason-
 ableness of the rate provisions as a package, and 
 these provisions would rise or fall together without 
 undermining the statutory policy in favor of volun-
 tary dispute resolution.
 
Respondent's Br. at 42-43.

 On the record at hand, we conclude that the rule is a 
reasonable exercise of the agency's duty under the statute to 
guarantee fair competition in the attachment market. The 
agency's limited authority to review negotiated settlements is 
consistent with the statute and it does not interfere with any 
of the rights afforded petitioners under the Act.

D. Conduit Space Rules

 Finally, petitioners contend that the FCC's decisions on 
conduit space and fees are unlawful and unreasonable. Ac-
cording to petitioners, the Reconsideration Order fails to 
recognize that portions of conduits are unusable for purposes 
of computing the appropriate attachment formula. Petition-
ers also contend that, without explanation or support in the 
record, the FCC reversed the Telecom Order decision that 
conduit space reserved for maintenance and emergency use is 
reserved for the benefit of all conduit occupants; that such 
reservation renders that duct unusable; and that the costs of 
the space should be allocated to those who benefit from it. 

Petitioners argue further that the FCC engaged in arbitrary 
and capricious decision-making when it derived a rebuttable 
presumption that an attacher occupies only one-half of a duct 
or conduit. We find no merit in these contentions.

 The Commission did not shift its position without explana-
tion or good reason, as petitioners contend, when it adopted 
the unusable space rule. Rather, the Commissioner's Recon-
sideration Order is cogent on this issue:

 In the Fee Order, we reviewed the Fee Order 
 Notice filings as well as the Telecom Order petition 
 filings and concluded that other than collapsed ducts 
 which are not counted in determining total capacity, 
 there is no unusable capacity in a conduit. This was 
 a departure from our conclusion in the Telecom 
 Order and we now affirm our conclusion in the Fee 
 Order. The total capacity of a duct or conduit is the 
 entire volume of available capacity in the conduit 
 system. All costs associated with the construction of 
 the conduit system are considered in determining 
 the cost of this total capacity.
 
 ... 
 
 We will not allow capacity designated for mainte-
 nance, future business plans, or municipal set-asides 
 to be subtracted from the total duct or conduit 
 capacity for rate determination purposes. The rec-
 ord supports our analysis that capacity in a duct or 
 conduit that is usable for any of these purposes is 
 part of the "total duct or conduit capacity." For 
 example, a utility may set-aside capacity for mainte-
 nance or emergencies so that unoccupied capacity is 
 available into which a temporary cable may be 
 placed and spliced into a damaged cable. Capacity 
 so designated is usable in the event it is needed, and 
 available for use by the utility at any time for any 
 purpose, and is therefore part of the total available 
 conduit capacity. Such reservation of capacity is not 
 necessarily identified by a specific duct or location, 
 can be treated, used, withdrawn or discarded at the 
 
 sole discretion of the utility, and must be considered 
 part of the total capacity of the conduit.
 
Reconsideration Order, 12,147, 12,149 pp 88, 93, J.A. 43, 47.

 The FCC's rule adopting a presumption for duct space is 
not facially invalid. The rule merely establishes a rebuttable 
presumption. See id. at 12,150-51 p 95, J.A. 46; see also id. 
at 12,152 p 98, J.A. 48 ("When the actual percentage of 
capacity is known, it can and should be used instead of the 
one half presumption."). The possibility that a utility can 
present information showing that an attached wire or cable 
occupies more than half of the duct space makes it clear that 
the rule is not facially unreasonable.

 We will not otherwise address the merits of this rule, 
however, because petitioners' challenge to the rule as applied 
is unripe. See City of Houston, 24 F.3d at 1430-32. The 
same considerations that prompted our dismissal of petition-
ers' as-applied challenge to the rule regarding presumptions 
for the number of attaching entities apply here as well.

 III. Conclusion

 For the reasons stated above, the petitions for review of 
the FCC Orders are hereby denied.