# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 19, 2012   Decided February 21, 2012

No. 11-1215

GULF POWER COMPANY,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS

FLORIDA CABLE TELECOMMUNICATIONS ASSOCIATION, INC.,
ET AL.,
INTERVENORS

———

On Petition for Review of an Order of
the Federal Communications Commission

———

*Eric B. Langley* argued the cause for petitioner. With him on the briefs were *J. Russ Campbell*, *Jason B. Tompkins*, and *Ralph A. Peterson*. *Allen M. Estes* entered an appearance.

*Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, *Austin C. Schlick*, General Counsel, Federal

Communications Commission, *Peter Karanjia*, Deputy General Counsel, and *Laurel R. Bergold*, Attorney.

*John D. Seiver*, *Ronald G. London*, and *Christopher A. Fedeli* were on the brief for intervenors Florida Cable Telecommunications Association, Inc., et al., in support of respondents.

Before: TATEL and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In 1978 Congress passed the Pole Attachments Act, which set a ceiling and a floor on the price that cable television operators and telecommunications carriers (here called cable operators for simplicity's sake) must pay to attach their lines to a power company's utility poles. See 47 U.S.C. § 224(d). The act directs the Federal Communications Commission to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable," *id*. § 224(b)(1), and then sets the bounds for what is "just and reasonable":

> [A] rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space . . . which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

*Id*. § 224(d). Congress thus specified a minimum charge (characterized by the Supreme Court as the "marginal cost of

[the] attachments," *FCC v. Florida Power Corp.*, 480 U.S. 245, 253 (1987)) and a maximum ("the fully allocated cost of the construction and operation of the pole to which [the] cable is attached," *id.*). The FCC promulgated regulations that clarified how to calculate the upper limit of Congress's formula and appeared to make the maximum rate the ceiling for what the utility may charge (as the word maximum implies). See 47 C.F.R. § 1.1409(e); but cf. *id.* § 1.1409(b).

While specifying rate limits, the 1978 act left utilities free to refuse attachment. In 1996 Congress added a requirement that utilities allow attachment except in cases of "insufficient capacity" or for "reasons of safety, reliability and generally applicable engineering purposes." 47 U.S.C. § 224(f).

Soon after the 1996 amendments, petitioner Gulf Power and other utility companies increased their pole attachment rates to levels above the statutory maximum. Several cable operators filed a complaint against Gulf with the FCC, which ruled that Gulf's increased rates violated the act and the FCC's implementing regulations.

Gulf now seeks review of that order, arguing that the act fails to provide for just compensation under the Fifth Amendment, and that the FCC's decision is arbitrary and capricious, or is otherwise not supported by substantial evidence. We find the doctrine of collateral estoppel (or "issue preclusion") a fatal bar to Gulf's assertion of the constitutional issue, and its remaining arguments unavailing. We thus deny the petition.

* * *

Gulf primarily contends that the act and the FCC's implementing regulations fail to provide just compensation for power companies forced to allow attachments at the

4

prescribed rates. The FCC responds that the Eleventh Circuit's rejection of that claim in *Alabama Power Co. v. FCC*, 311 F.3d 1357 (2002), bars Gulf's pursuit of it here. Gulf and Alabama Power are both wholly owned subsidiaries of a third company, Southern Company. For reasons elaborated below, we agree with the Commission.

In *Alabama Power* the court faced a challenge by Gulf's sister company to the precise scheme at issue here. Alabama Power, like Gulf, argued that "the statute and regulations fail to provide just compensation." *Id*. at 1367. The Eleventh Circuit held that, outside of certain limited circumstances, the act's rates amounted to just compensation. *Id*. at 1370-71. Although acknowledging that mandatory attachments could impose an opportunity cost on a utility (namely, loss of the advantage of either using attachment space itself or renting it to another), the court held that the takings clause did not require compensation for that cost in the absence of actual crowding. Thus, it concluded, the act and regulations failed to specify just compensation *only* when a power company could show that "(1) the pole [in question] is at full capacity and (2) either (a) another buyer of the space is waiting in the wings or (b) the power company is able to put the space to a higher-valued use with its own operations." *Id*. at 1370. Because the act itself allows the utility to refuse access altogether in cases of "insufficient capacity," 42 U.S.C. § 224(f)(2), we take it that the *Alabama Power* formula will only become relevant in cases where the current set of attachments have filled the pole to capacity and the utility is then presented with either of the two opportunities discussed in part (2) of the formula, namely renting the occupied space to another at a higher rate or using that space itself for a higher-valued use. Refinements of this sort, however, are unnecessary to resolve this case.

The doctrine of issue preclusion generally bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001); see also *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Gulf argues that neither the issue nor the parties are identical to those in *Alabama Power*.

As to parties, it is true that Gulf was not a party to that decision (though the FCC obviously was). But there are a number of exceptions to the requirement of identical parties (six, according to the Supreme Court's count in *Taylor*, 553 U.S. at 893), of which the most pertinent is the case where the party sought to be barred exercised such control over the prior litigation that he can be said to have "'had his day in court' even though he was not a formal party," *id*. at 895 (quoting 1 RESTATEMENT (SECOND) OF JUDGMENTS § 39 cmt. a (1982)).

We find such control here. Gulf and Alabama Power were under the common control and complete ownership of their parent entity, Southern Company. See Southern Co., Form 10-K, Annual Report for the Fiscal Year Ending Dec. 31, 2010, at I-1 (Feb. 25, 2011) ("10-K"). Both companies were thus servants to the same master. There seems at most only a trivial difference between a case where the party sought to be barred is a parent of a corporate party in the first litigation, and one where the two parties are fellow wholly-owned subsidiaries. Compare *Fitzgibbon v. Martin County Coal Corp.*, No. 05-36, 2007 WL 1231509, at *9 (E.D. Ky. Apr. 25, 2007) (rejecting such an equation without explanation).

While that relationship alone may not always show sufficient control, it plainly does so in this context. Gulf filed its own petition for review in *Alabama Power* as an intervenor, it was a signatory on both Alabama Power's

opening and reply briefs in the case, and its counsel presented oral argument in the Eleventh Circuit on behalf of both companies. See Respondents' Br. 40. Although the Eleventh Circuit's decision dismissed Gulf's petition for lack of standing before reaching the merits, *Alabama Power Co.*, 311 F.3d at 1366-67, Gulf does not dispute that it had a full and fair opportunity to present its arguments in *Alabama Power*. Moreover, Gulf and Alabama Power are hardly subsidiaries representing distant wings of a far-flung conglomerate. They both provide power and power transportation in a specific region of the country, and do so in close coordination. See 10-K at I-2 (describing Southern and its affiliates as constituting the "Southern Company System" whose power sources are "interconnected with the [other affiliates'] transmission facilities" and which "operate[] as a single integrated electric system"). Taking all of these factors into consideration, we think that Gulf has had an ample day in court.

Gulf claims, however, that the central issue in *Alabama Power*—whether the statutory scheme provides just compensation—is quite different from the one it tries to raise here—"Is [the *Alabama Power*] 'test' . . . inconsistent with settled, Fifth Amendment takings jurisprudence[?]" Petitioner's Reply Br. 9. Put another way, Gulf argues that the issue in the *Alabama Power* was the constitutionality of the scheme, whereas the issue before us now is whether *Alabama Power* decided that issue correctly. But if an issue can be turned into a new issue merely by asking whether it had been rightly decided, collateral estoppel would never apply.

Recognizing that we might find it bound by *Alabama Power*, Gulf contends that the FCC applied that decision's exception to the rate scheme too narrowly. As we saw earlier, *Alabama Power* required a utility, trying to show that the act's

rate scheme failed to provide just compensation, first to prove that its poles were "at full capacity." 311 F.3d at 1370. Gulf tried to show full capacity by evidence that some poles could receive attachments only if some work were performed on the existing attachments. The FCC rejected the evidence on the ground that it would show full capacity only under an assumption "that a pole is at full capacity whenever any make-ready work [e.g., rearrangement of existing attachments] would be required to accommodate a new attachment." *In the Matter of Fla. Cable Telecomms. Ass'n Inc. et al. v. Gulf Power Co.*, 26 FCC Rcd. 6452, 6462 ¶ 25 (2011) ("Order"). The FCC, instead, reasoned: "When a new attacher could be accommodated by rearranging existing attachments or with conventional attachment techniques to the same extent that the utility uses them, . . . the pole is not at full capacity." *Id.* ¶ 24 Gulf defends its assumption, arguing that otherwise the pole rate scheme forces it to expand the normal capacity of a pole in a way that is inconsistent with *Alabama Power* and with an earlier Eleventh Circuit decision, *Southern Co. v. FCC*, 293 F.3d 1338, 1346 (2002). See Petitioner's Br. 39-41.

We find the FCC's interpretation in accord with both the Eleventh Circuit decisions and with common sense. In *Alabama Power*, the Eleventh Circuit explicitly noted that the pole rate scheme already provided for the reimbursement of the make-ready costs of any new attachments, see 311 F.3d at 1368-69. As there is no reason to assume the court suddenly forgot that fact when it was crafting its exceptions to the rate scheme, it must have understood that the statutory formula was adequate in at least some cases involving make-ready work.

Nor is *Southern Company* to the contrary. The court there held that in a situation where "*it is agreed that capacity on a given pole . . . is insufficient*," the FCC may not order

make-ready work. 293 F.3d at 1346 (emphasis added); see also *id*. at 1347, 1352. That condition (insufficient capacity) is, after all, precisely the one under which 47 U.S.C. § 224(f)(2) absolves the utility of any duty to provide access. But the necessity of make-ready work before attaching a new cable does not, by itself, entail "expanding" a pole's capacity or indicate that capacity was insufficient. Anyone who has had to rearrange plates in a dishwasher to fit in one more item, or to reconfigure plugs on a power strip to attach one more electronic device, knows that such "make-ready" work does not expand the device's capacity (in the normal sense of those words), but merely makes possible a more efficient use of existing capacity. The FCC's interpretation of "full capacity" is thus fully consistent with the Eleventh Circuit's definition, and is not arbitrary and capricious.

With this interpretation in mind we hold that Gulf failed to meet its burden to show that its poles are at full capacity, as required by *Alabama Power*. Because proving full capacity is a prerequisite to qualifying for the *Alabama Power* exception, we need not reach Gulf's arguments concerning the legal standards and record evidence involved in the second of the exception's preconditions—whether Gulf could show that there were other buyers waiting in the wings or other higher-valued uses for the utility pole space.

* * *

The petition for review is

*Denied*.