**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2042-19

EQUITY REAL ESTATE
MANAGEMENT, LLC, as
Court-appointed Rent Receiver,

      Plaintiff-Respondent,

v.

PAUL V. PROFETA &
ASSOCIATES, INC.,
EXECUTIVE CLEANING
CORP. and P.V.P.
MAINTENANCE CORP.,

      Defendants-Appellants,

and

PAUL V. PROFETA &
ASSOCIATES, INC.,

      Defendants/Third-Party
      Plaintiffs,

v.

BANK OF CHINA, NEW
YORK BRANCH,

Third-Party Defendants.

_____

Argued February 24, 2021 – Decided December 30, 2021

Before Judges Ostrer, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-8618-18.

Marc J. Gross argued the cause for appellants (Fox Rothschild LLP, attorneys; Marc J. Gross, of counsel and on the briefs; Christine F. Marks, on the briefs).

Joseph Lubertazzi, Jr., argued the cause for respondent (McCarter & English, LLP, attorneys; Joseph Lubertazzi, Jr., of counsel and on the brief; David S. Mordkoff, on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

In this commercial landlord-tenant case, three tenants challenge the Law Division's grant of summary judgment against them for holdover rent, service fees, interest, and attorney's fees. We affirm in part and reverse in part.

I.

This case is a sequel to the foreclosure action in <u>Bank of China, New York Branch v. 769 Assocs., LLC</u>, No. A-2100-18 (App. Div. Oct. 8, 2020) ("<u>Bank of China</u>"). The General Equity Part entered final judgment of foreclosure in favor of the Bank of China ("the Bank") after 769 Associates, LLC ("769")

defaulted on its $14.35 million mortgage loan. The General Equity Part also appointed a rent receiver and later invalidated extensions and amendments of leases between 769 and three of its tenants, which are the defendants here: Paul V. Profeta & Associates, Inc. ("PVP Associates"), Executive Cleaning Corp. ("Executive") and P.V.P. Maintenance Corp. ("Maintenance") (collectively, "the Tenants"). Paul V. Profeta is an owner of 769 and evidently solely owns each tenant.[1] The General Equity judge held that 769 lacked authority to enter the leases because: the court orally granted the motion to appoint a rent receiver before the extensions were executed; and the loan agreement required 769, as a defaulting borrower, to get the Bank's approval of leases, which it did not do.

We affirmed the final judgment of foreclosure in favor of the Bank, based on 769's maturity default. Bank of China, slip op. at 4. We also affirmed the court's order voiding the extension and amendments of the leases. Id., slip op.

---

[1] The summary judgment record does not include competent evidence of Profeta's ownership of the Tenants or 769. However, the Tenants' counsel stated before the trial court in this case that the "membership" of 769 and the Tenants was not the same; it was his "understanding" that Profeta was the Tenants' sole shareholder; but Profeta was "an owner" of 769. We note that the original 2007 loan agreement between 769 and the Bank stated that Profeta owned ninety-nine percent of the membership interests in 769, and that L.L.C.P.V.P. Corp. owned one percent, and Profeta was 769's sole manager, and he owned all the stock of L.L.C.P.V.P. Corp. But ownership may have changed between 2007 and entry of the amended leases.

A-2042-19

at 9.  We held, among other things, that 769 lacked standing to complain the Tenants were not made parties to the foreclosure action in which their leases were invalidated.  Ibid.  We also rejected 769's argument that the General Equity Part lacked jurisdiction to invalidate the leases.  Ibid.  Notably, 769 did not challenge the substance of the General Equity Part's decision that 769 lacked authority to extend and amend the leases.

In the meantime, the rent receiver, Equity Real Estate Management ("Equity"), brought this action in the Law Division for rent and fees.  It is undisputed that, except for certain payments in February 2018, the Tenants paid no rent for December 2017 through January 2019, when they vacated 769's building.  The trial court[2] held that the Tenants were holdovers during that time and liable for rent at the increased holdover rate under the prior lease, which had expired. The trial court denied the Tenants' motion for leave to file a counterclaim and rejected the Tenants' defense that Equity breached the covenant of quiet enjoyment and failed to provide services or maintain the premises.  The court held that the prior lease's provisions and the Tenants' holdover status barred those claims.  The court entered judgment for holdover

---

[2] To avoid confusion, we use "trial court" to refer only to the Law Division, and use "General Equity Part" to refer to the judges in the foreclosure matter.

rent, service fees and interest of $616,653.07 against PVP Associates; $104,908.54 against Executive; and $165,619.21 against Maintenance. The court also awarded $76,194.45 in counsel fees and $6,506.29 in costs — to be divided equally among the Tenants.

The Tenants' challenge these orders on appeal.

II.

Reviewing the summary judgment order de novo, applying the same standard as the trial court, see Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014), we must decide two overarching issues on appeal: (1) were the Tenants holdovers between December 2017 to January 2019, and therefore liable for rent at the holdover rate; and (2) are the Tenants entitled to any reduction in the rent because of Equity's alleged breaches. In doing so, we review issues of law de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Those include issues of lease interpretation. See EQR-LPC Urb. Renewal N. Pier, LLC v. City of Jersey City, 452 N.J. Super. 309, 319 (App. Div. 2016) (stating "[c]ontractual interpretation is a legal matter ordinarily suitable for resolution on summary judgment"), aff'd o.b., 231 N.J. 157 (2017); Town of Kearny v. Discount City of Old Bridge, Inc.,

A-2042-19

205 N.J. 386, 411 (2011) (applying basic principles of contract interpretation to lease).

A.

We consider the Tenants' status first. Each tenant originally entered a ten-year lease ("Original Lease") with 769 that expired December 31, 2015.[3] Each tenant and 769 entered a First Amendment to Lease ("First Amendment"), dated December 1, 2015, extending the lease term to December 31, 2016; a Second Amendment to Lease ("Second Amendment"), dated December 1, 2016, extending the term to December 31, 2017; and finally, a Third Amendment to Lease ("Third Amendment") extending the lease term to December 31, 2022. Dated "for reference purposes," the amendments do not indicate when the parties actually signed them.

At oral argument before us, the Tenants conceded that the Third Amendment was void.[4] Instead, they focused on arguing that, even assuming

_____

[3] PVP Associates leased suite 250, almost 6000 square feet, plus garage space, at 769 Northfield Avenue in West Orange. Executive and Maintenance respectively leased about 1000 and 1500 square in the building's lower level. PVP Associates leased other space in the building, but those leases are not the subject of this appeal.

[4] In their briefing before we decided Bank of China, the Tenants argued the trial court mistakenly gave collateral estoppel effect to the General Equity Part's

decision to invalidate the Third Amendment. The Tenants contended they were not in privity with 769 and the decision was not essential to the foreclosure judgment; thus two requisites for applying collateral estoppel were absent. See In re Estate of Dawson, 136 N.J. 1, 20 (1994) (stating those requisites among others). Although 769 and the Tenants are separate entities, there is substantial authority for finding privity between closely held corporations and their owners for res judicata purposes, see Restatement (Second) of Judgments, § 59(3) (Am. L. Inst. 1982), and between such entities jointed by a common owner, see Gulf Power v. FCC, 669 F.3d 320, 323 (D.C. Cir. 2012) (finding privity between sister entities, stating, "[t]here seems at most only a trivial difference between a case where the party sought to be barred is a parent of a corporate party in the first litigation, and one where the two parties are fellow wholly-owned subsidiaries"); In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 19 (1st Cir. 2003) (finding privity regardless of whether entities were actually sister corporations and not parent-subsidiary). And even if the invalidation finding was not "essential" to the foreclosure, the order voiding the Third Amendment was entitled to claim preclusion provided there was privity between 769 and the Tenants. See McNeil v. Legis. Apportionment Comm'n, 177 N.J. 364, 395 (2003) (stating claim preclusion governs "valid, final and on the merits" prior orders if the parties in the two actions are identical or in privity and the claim in the second action "grow[s] out of the same transaction or occurrence" as the claim in the first action). Given the Tenants' counsel's concession, we do not decide these issues. Nor do we decide if Equity was judicially estopped from arguing privity between 769 and the Tenants after successfully arguing in Bank of China that 769 lacked standing to represent the Tenant's interests. See Bhagat v. Bhagat, 217 N.J. 22, 36 (2014) ("A party who advances a position in earlier litigation that is accepted and permits the party to prevail in that litigation is barred from advocating a contrary position in subsequent litigation to the prejudice of the adverse party."). We note that like 769 in Bank of China, the Tenants offered no substantive defense for 769's authority to enter into the Third Amendments, nor did they present any equitable basis for granting the Tenants' rights provided in the Third Amendments.

7

the Third Amendment was a nullity, that did not make the Tenants holdovers.[5] The Original Leases stated there would be a "Holdover Period" with rent twice the base rent or market rental value if the Tenants remained in possession "after the expiration of the Term of this Lease." The Tenants argued that absent the Third Amendments, the lease term automatically renewed for one additional year — that is, until December 31, 2018 — under the terms of the underlying Original Lease, as amended by the First Amendment and Second Amendment.

The Original Leases defined three critical terms: "Term," "Expiration Date" and "Initial Expiration Date." Section 1, the "Incorporated Terms" section, at subsection (d), states, "Subject to Section 3, the term shall be ten (10) Lease Years (the 'Term'), commencing January 1, 2006 ('Commencement Date') and ending at 11:59 P.M. December 31, 2015, ('Expiration Date')." Section 3, the "Term" section, at subsection (e), defines "Initial Expiration Date" to mean "the Expiration Date set forth in Section 1(d) hereof."[6]

---

[5] The trial court mistakenly held that the Tenants were holdovers because the General Equity Part so found. As Equity conceded at oral argument, the General Equity Part made no such finding. Therefore, we need not address whether such a finding, if made, would have been entitled to res judicata effect.

[6] We are not concerned with the additional statement that the Initial Expiration Date "may have been extended pursuant to Section 3(c) hereof," because Section 3(c) only deals with pushing back the Commencement Date if the lease started in the middle of a month.

A-2042-19

Utilizing these definitions, the Original Leases stated their term would automatically extend for one year if the tenant did not give notice to the landlord 120 days before the "Initial Expiration Date" that the tenant intended to vacate, and if the landlord did not give the tenant notice thirty days before the "Initial Expiration Date" that the landlord wanted the tenant to leave. The date one year after the "Initial Expiration Date" would then become "the new expiration date."

> If Tenant intends or desires to vacate the Premises at the Expiration Date set forth in Section 1(d) hereof . . . (the "Initial Expiration Date"), then, Tenant shall give written notice of said intention or desire to Landlord at least 120 days prior to the Initial Expiration Date, . . . . If for any reason whatsoever, Landlord does not receive such notice as above provided, the Term of this Lease shall be automatically extended for an additional one (1) year term on all of the same terms and conditions set forth in this Lease, and the new expiration date of this Lease shall become that date which is one (1) year after the Initial Expiration Date as if said new expiration date were the date originally set forth in Section 1(d) hereof, unless Landlord shall give Tenant notice at least thirty (30) days prior to the Initial Expiration Date that Tenant is required to surrender the Premises on the Initial Expiration Date in accordance with the Lease.

Notably, the words "the new expiration date" are not capitalized. Thus, the Original Leases distinguish between that date and the defined terms "Expiration Date" and "Initial Expiration Date." Only the failure to give notice before the

9

"Initial Expiration Date" triggers renewal for one year. Thus, the automatic renewal provision in the Original Leases operated just once.

However, the First Amendment and Second Amendment to each lease amended the definition of "Expiration Date," pushing it back ultimately to December 31, 2017. The First Amendment states:

> The parties agree that the Term of the Lease shall be and hereby is extended for an additional one (1) year commencing January 1, 2016, and expiring December 31, 2016. From and after the date of this First Amendment all references in the Lease to the Expiration Date shall be deemed references to December 31, 2016.

> [(Emphasis added).]

"Lease" in the prior quoted sentence means the "Original Lease," because "Lease" is used in contrast with "First Amendment" throughout the First Amendment. For example, the First Amendment said, "In the event of any conflict between the terms of the Lease and the terms of this First Amendment, the terms of this First Amendment shall control."

But, in all other respects, the Original Leases survived. The amendments stated, "The parties agree that except for this First Amendment the Lease entered into as of December 12, 2005, has not been modified, amended or otherwise altered." Furthermore, the amendments state that "Terms utilized in this First

10

Amendment which are not expressly defined in this First Amendment shall have the definitions set forth for such terms in the Lease." The First Amendment also stated, "All of the terms and conditions set forth in the Lease shall be applicable to the aforesaid additional one (1) year period" and the Annual Base Rent would be the rate in effect in December 2015.

The Second Amendment included the same quoted language as the First Amendment, except the dates were one year later. Thus, "all references in the Lease to the Expiration Date shall be deemed references to December 31, 2017."

Thus, as we read the three documents together, as the documents themselves command, the First Amendment and Second Amendment each revived the operation of the automatic renewal one more time. Focusing on the Second Amendment, by inserting December 31, 2017, for the "Expiration Date" wherever it appears in the Original Leases, the Second Amendment modifies Section 1(d) to provide that the term shall end "at 11:59 P.M. December 31, 2017 ('Expiration Date')." Consequently, this change in Section 1(d) redefines the meaning of "Initial Expiration Date" in Section 3(e). That is so because the "Initial Expiration Date" is defined by referring to the "Expiration Date" in Section 1(d). Section 3(e), as revised by the Second Amendment, reads: "If Tenant intends or desires to vacate the Premises at the Expiration Date" — now,

 A-2042-19

December 31, 2017 — "set forth in Section 1(d) hereof . . . (the Initial Expiration Date), then, Tenant shall give written notice of said intention . . . ."  And the failure to give notice "prior to the Initial Expiration Date" — now redefined as December 31, 2017 — results in extending the lease "an additional one (1) year term on all of the same terms and conditions set forth in this Lease, and the new expiration date of this Lease shall become that date which is one (1) year after the Initial Expiration Date" — meaning one year after December 31, 2017, in other words, December 31, 2018.

Nothing in the Second Amendment or First Amendment conflicts with the operation of Section 1(d) and Section 3(e) as amended.  The amendments do not address the automatic renewal provisions.  And to the extent they do not expressly define terms, the amendments retain the definitions in the Original Leases.  That includes, notably, the definition of "Initial Expiration Date" as "the Expiration Date set forth in Section 1(d)."

It is undisputed that the Tenants did not provide notice of the intention to vacate 120 days before the new Initial Expiration Date of December 31, 2017; and 769 did not provide notice to surrender the premises thirty days before that new Initial Expiration Date.  Therefore, the leases extended for an additional one-year term ending December 31, 2018, during which the Tenants were not

holdovers.  However, they were holdovers beginning January 1, 2019, because, absent yet another amendment of the "Initial Expiration Date," December 31, 2018, was the "new expiration date" — without capitalization — that did not trigger a possible additional one-year term.

Thus, the rent due for January 1, 2018, to December 31, 2018, shall be the rent due under the Lease, including the "Annual Base Rent in effect immediately prior to the commencement of said additional one (1) year term."  And the holdover rent shall apply only to the time the Tenants occupied the premises after December 31, 2018.

B.

We next consider if the Tenants are entitled to a set-off or reduction of the rent otherwise due because Equity allegedly breached the covenant of quiet enjoyment, failed to provide essential services such as snow removal, and failed to maintain the building.[7]  PVP Associates sent emails to Equity in March and April 2018 complaining of the deplorable conditions.  PVP Associates stated,

---

[7]  The Tenants supplied emails from other tenants in the building complaining about the conditions there.  However, those emails were hearsay and inadmissible on the motion.  See R. 1:6-6; Chicago Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 457 (App. Div. 2009) (explaining that hearsay statements "cannot be considered evidence in the summary judgment record showing a disputed issue of fact").

13

"the building has become uninhabitable," because of lack of heat, sewage backup, mold on the walls, and inadequate snow removal, and it would withhold rent "until conditions improve, if they ever do." In a certification, PVP Associates' chief financial officer Steven L. Coleman identified specific problems with sewage in February; heat in February and March; water service in April; and heat again beginning in November. Coleman mentioned other problems. However, none of them evidently was serious enough to compel the Tenants to vacate the premises.

Equity cites numerous lease provisions that disable the Tenants from claiming a set-off or damages based on its alleged failure to provide services. Some of the provisions are more controversial than others. We are satisfied that the Tenants' defenses — and their proposed counterclaims — are barred by two of them.

Section 7(a) conditioned services that the Tenants complain were not provided upon the Tenants not being in default: "As long as Tenant is not in default under this Lease, Landlord shall furnish to the Premises only during Work Hours (hereinafter defined) the services set forth on the Services Rider attached hereto." Included among the services described in the rider were snow removal, maintenance and repairs and cleaning.

A-2042-19

The Tenants have not established that any alleged breach of the obligation to provide services preceded their rent payment default. They began defaulting on their obligation to pay rent in December 2017. The Tenants allege, vaguely, that "not long after the Receiver assumed responsibility for the Premises" — the order appointing the receiver was entered December 7, 2017 — maintenance deteriorated.

In any event, the Original Leases at section 27 provided that the landlord would not be in default for failing to perform obligations under the lease unless it failed to cure the issue within thirty days of notice from the tenant. The Tenants provide no proof of such notice in compliance with the leases' notice provisions.[8] And PVP Associates sent its emails long after the Tenants' default of their obligation to pay rent.

In sum, we conclude that the trial court did not err in rejecting the Tenants' defenses. For the same reason, we discern no error in the court's order denying the Tenants' motion for leave to file a counterclaim asserting claims arising out

---

[8] Therefore, we do not address the enforceability of the lease provision that required the Tenants to pay rent without (in all-caps) "counterclaim, deduction or set-off."  But see Invs. Sav. Bank v. Waldo Jersey City, LLC, 418 N.J. Super. 149, 154-56 (App. Div. 2011) (holding that a loan provision waiving "any right of setoff, counterclaim or other defense" "when applied in an action by a lender for damages, would be contrary to public policy").

A-2042-19

of Equity's management (or, according to the Tenants, mismanagement) of the building.

## III.

The Tenants also appeal from the trial court's award of attorneys' fees and costs. The Tenants do not dispute that the landlord is entitled to "all reasonable attorneys' fees" incurred in enforcing the Tenants' obligations under the leases. The Tenants argue that Equity's counsel did not comply with RPC 1.5 and Rule 4:42-9(b) and the trial court failed to carefully and critically evaluate Equity's fee application.

In reviewing the award of reasonable attorneys' fees based on a contractual fee-shifting provision, the Court stated, "The threshold issue in determining whether an attorneys' fee award is reasonable is whether the party seeking the fee prevailed in the litigation." N. Bergen Rex Transp. v. Trailer Leasing Co., 158 N.J. 561, 570 (1999). And "when a substantial portion of a claim sought is ultimately rejected, that circumstance should be considered along with other factors, including those contained in RPC 1.5(a) to determine a reasonable award of attorneys' fees." Id. at 573-74. Notwithstanding our deferential standard of review of a trial court's fee award, see Rendine v. Pantzer, 141 N.J. 292, 317 (1995) (stating we should disturb them "only on the rarest occasions

. . . because of a clear abuse of discretion"), we are constrained to remand because our holding on the lease extension results in a significant reduction in the rent due.

The trial court shall also amplify its findings regarding the reasonableness of the hourly rates and time expended. "The starting point in awarding attorneys' fees is the determination of the 'lodestar,' which equals the 'number of hours reasonably expended multiplied by a reasonable hourly rate.'" Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21 (2004) (quoting Rendine, 141 N.J. at 335). "[T]he trial court's determination of the lodestar amount is the most significant element in the award of a reasonable fee . . . ." Rendine, 141 N.J. at 335. The trial court should calculate "a reasonable hourly rate . . . according to the prevailing market rates in the relevant community." Rendine, 141 N.J. at 337 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). In performing this calculation, "the court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Ibid.

However, the judge's "personal opinion . . . predicated solely on his or her own professional experiences does not satisfy the analysis required by the Court

under <u>Rendine</u> to determine a reasonable hourly rate." <u>Walker v. Giuffre</u>, 415 N.J. Super. 597, 607 (App. Div. 2010), <u>rev'd on other grounds</u>, 209 N.J. 124 (2012); <u>see also</u> <u>Seigelstein v. Shrewsbury Motors, Inc.</u>, 464 N.J. Super. 393, 408 (App. Div. 2020). Equity's counsel did not discuss the fee customarily charged in the locality for similar legal services, RPC 1.5(a)(3), nor its "paraprofessionals' qualifications, and the attorney's billing rate for paraprofessional services to clients generally." <u>R.</u> 4:42-9(b). In concluding that the rates Equity's lead counsel, senior and junior attorneys and paraprofessionals "were all the customary fees for folks of his experience," the trial judge evidently relied on his personal and professional experiences. Notably, the fee certification did not set forth the experience and backgrounds of the individuals who worked on the file.

Furthermore, the court shall not award fees for services for which a description was omitted or redacted to the point that no assessment of the entry is possible. We leave it to the court to determine whether to permit counsel on remand to submit less redacted bills or to submit some of the bills for the court's review in camera to protect attorney-client privilege.

On remand, the court shall also reconsider the award of costs for items properly considered part of an attorney's usual overhead. <u>See</u> <u>In re Malone</u>, 381

18                                                                              A-2042-19

N.J. Super. 344, 352 (App. Div. 2005) (affirming fee reduction for photocopying, which "represented normal office overhead, for which reimbursement was not appropriate"); In re Estate of Reisen, 313 N.J. Super. 623, 635-37 (Ch. Div. 1998) (finding that "overhead of the firm is or should be included in the calculation of appropriate hourly rates").

## IV.

In sum, we remand for recalculation of the amount of rent, service fees and interest due, inasmuch as the Tenants occupied the premises in 2018 pursuant to the leases as amended. The court shall also reconsider the counsel fee award.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION